**Jeanne Y. JAGOW, Trustee; Stephen A. Hellerstein, Trustee; Stephen A. Hellerstein, Successor Trustee to L.A. Hellerstein, Trustee; and Howard L. Farkas, Petitioners,**

v.

**E–470 PUBLIC HIGHWAY AUTHORITY, Respondent.**

No. 01SC169.

Supreme Court of Colorado, En Banc.

July 1, 2002.

Duncan, Ostrander & Dingess, P.C., Robert R. Duncan, Donald M. Ostrander, Lynn B. Obernyer, James Birch (Special Counsel), Denver, Colorado, Attorneys for Respondent.

Opperman & Associates, P.C., Marlin D. Opperman, William M. Schell, Denver, Colorado, Attorneys for Petitioners.

Justice HOBBS delivered the Opinion of the Court.

This case arises out of an eminent domain proceeding brought by the respondent, E–470 Public Highway Authority ("E–470"), to acquire a portion of the Hellerstein property ("property") from the petitioners, Jeanne Y. Jagow, Trustee; Stephen A. Hellerstein, Trustee; Stephen A. Hellerstein, Successor Trustee to L.A. Hellerstein, Trustee; and Howard L. Farkas (collectively "Hellerstein"). E–470 condemned a portion of the Hellerstein property for construction of the E–470 Highway. The valuation commission entered a condemnation award of $1,323,691.15 for the value of the property taken, $2,888,272.80 for alleged damages to the remainder property, and $297,000.00 for special benefits. The court of appeals overturned the remainder property damages award as unsupported by the evidence and

excessive as a matter of law. *E–470 Pub. Highway Auth. v. Jagow*, 30 P.3d 798, 804 (Colo.App.2001). We granted certiorari to review the court of appeals' judgment.[1]

We hold that the $2.88 million award for damages to the remainder property had no support in the evidence and was excessive as a matter of law. At the valuation hearing, Hellerstein had the burden of proof to establish: (1) the existence of damages to the remainder property; (2) the E–470 Highway project caused these damages; and (3) the amount of compensation owed. *La Plata Elec. Ass'n, Inc. v. Cummins*, 728 P.2d 696, 696–97 (Colo.1986); *Troiano v. Colo. Dep't of Highways*, 170 Colo. 484, 491, 463 P.2d 448, 451 (1969).

We conclude that the evidence does not support the remainder property damages award. Other than the $100,000 cost to redo the development plan, Hellerstein identified no compensable, quantifiable damages to the remainder property unrelated to loss of access, a damage factor that was held inadmissible by the trial court. We therefore affirm the court of appeals' judgment.

I.

E–470 filed a Petition in Condemnation to acquire a portion of the Hellerstein property for construction of the highway. The entire Hellerstein property comprised approximately 351 acres of undeveloped land. The City of Aurora had annexed and designated the property as commercial, office, and industrial use areas under its Master Plan. The property is located near the northwest corner of the interchange of Gun Club Road and Interstate 70. In the eminent domain proceeding, E–470 acquired approximately 60.9 acres claimed in fee, 11.3 acres in permanent easements, and 1.3 acres in temporary construction easements.

Prior to the valuation trial, the trial court held an *in limine* evidentiary hearing regarding alleged damages to the remainder property. Hellerstein's experts were pre-

---

1. We granted certiorari on the following issue: Whether the court of appeals erred by requiring the award of damages to the remainder to be supported by the opinion of an individual witness, rather than recognizing the award can be supported by direct comparable sales evidence and the combination of several witness opinions.

pared to testify at the valuation trial that the value of the remainder property would be significantly diminished by the loss of access that would result from the construction of the E–470 Highway. Hellerstein's first expert, Mr. Peterson, would have assigned the remainder property a pre-taking value of $8,230,000.00 and a post-taking value of $4,330,000.00, resulting in damages of $3,900,000.00. Hellerstein's second expert, Mr. Van Court, would have assigned the remainder property a pre-taking value of $6,981,450.00 and a post-taking value of $2,948,400.00, resulting in damages of $4,033,050.00. E–470's expert, Mr. Hegarty, would have determined that the remainder property had not been damaged by the E–470 Highway project, but rather had benefited from it. Thus, he valued the remainder property at $2,517,000.00 before the taking, and $2,798,000.00 after the taking, resulting in a special benefit of $281,000.00.

However, the trial court ruled that the E–470 project did not substantially impair access to the remainder of the property. *See State Dep't of Highways v. Davis*, 626 P.2d 661, 665–66 (Colo.1981); *Troiano*, 170 Colo. at 495, 463 P.2d at 453 ("Colorado cases have held that mere inconvenience and mere circuity of route necessary for access or egress occasioned by a public improvement are not compensable items of damage."). The trial court therefore ordered Hellerstein *not* to present evidence concerning impairment of access to the remainder property, and held that any evidence concerning that factor of damage would be inadmissible at the valuation trial before the commissioners.[2]

Following the trial court's ruling, E–470's counsel argued that Hellerstein's experts should not be allowed to testify before the commission at all, because they could not segregate out damages due to lack of access from their appraisals. The trial court denied E–470's request, stating that the experts would be allowed to testify, but that any testimony given by them "should not reflect any compensation as they have found it to be related to access." The court then asked

Hellerstein's attorney to describe the testimony that the experts would give in light of this pre-trial ruling:

THE COURT:

When and what are they going to testify?

MR. OPPERMAN [Hellerstein's Counsel]:

I believe at this point, Your Honor, as it's related to damages, *Mr. Bagley* would testify to his cost to redo the Century 21 subdivision in the $80,000 or $80,000 plus, and that was disclosed in his deposition and his report. *Mr. Peterson* will testify to $100,000 as his opinion of the value to redo the subdivision plat. *Mr. Van Court* will testify that if there are any damages to the remainder, they would be what Mr. Bagley has stated to be for the redrawing or reprocessing the subdivision plat pursuant to the Court's order limiting damages in this case. So we would expect to put on our testimony with respect to the value of the whole in the before condition or value of the taking in the before condition and our limited damages based upon the Court's ruling allowing us to put in damages other than anything related to access. Now, with that statement, the one concern is obviously redoing the plat. Also redoing the access points.

THE COURT:

So far as it relates to redoing the plat, that doesn't relate to the ruling I just made.

(Emphasis added.) Thus, the offer of proof did not include the access issue.

At the valuation hearing before the commissioners, Hellerstein put its three identified experts on the stand in their case-in-chief. None of these experts testified to an after-taking value of the remainder property. Mr. Peterson and Mr. Van Court testified to their before-taking valuation of the property and certain factors that would affect the property's value after the taking. However, they did not identify any damages to the

---

2. Hellerstein did not appeal the trial judge's ruling precluding consideration of damages result-

ing from loss of access.

remainder property unrelated to loss of access, nor did they assign a monetary value to any alleged damages caused by the E–470 project. Mr. Bagley testified that it would cost $100,000 to redo the planning and zoning of the remainder property.

E–470's expert, Mr. Hegarty, testified that the remainder property had not been damaged by the E–470 Highway project, but rather had benefited from it.

At the conclusion of the valuation trial, the commission rendered a Certificate of Ascertainment and Assessment which assessed the following: $1,323,691.15 for the value of the property taken; $2,888,272.80 for damages to the remainder property; and $297,000.00 for specific benefits accruing to the remainder property. The trial court denied E–470's motion for judgment notwithstanding the verdict. It found that, based upon its review of the evidence and the available trial transcripts, there was a factual basis presented to the commission to support its damage assessment. Therefore, the trial court entered judgment in accordance with the commission's assessment.

On appeal, the court of appeals overturned the award of $2.88 million for damages to the remainder property as unsupported by the evidence and excessive as a matter of law. *E–470 Pub. Highway Auth. v. Jagow*, 30 P.3d 798, 804 (Colo.App.2001)("Even considering the testimony of [Hellerstein's] witnesses, there is no basis in the record for a damages award in this amount. Accordingly, the trial court should have granted [E–470's] motion for post-trial relief as to this issue."). It found that no evidence was presented to the commission to support a damages award in excess of $100,000. It then directed the trial court to offer Hellerstein the option of a remittitur, or, if Hellerstein did not accept the remittitur, to order a new trial on the

amount of compensation due for damages to the remainder property.[3] *Id.* at 805.

## II.

We hold that the $2.88 million award for damages to the remainder property had no support in the evidence and was excessive as a matter of law. We therefore affirm the court of appeals' judgment.

## A.

### Eminent Domain Proceedings

■ Private property shall not be taken or damaged for public or private use without just compensation. Colo. Const. art. II, § 15. Damages to the remainder property are cognizable under Colorado law. "When a portion of a landowner's property is taken, just compensation includes compensation for injury to the remainder of the property as well as payment for the portion actually taken." *La Plata Elec. Ass'n*, 728 P.2d at 698.

■ In an eminent domain proceeding, the court determines all questions and issues except the amount of compensation. § 38–1–101, 10 C.R.S. (2001). A board of commissioners of not less than three disinterested and impartial freeholders ascertains the amount of compensation. *Id.*[4] The trial judge's function is to convene the commission, make evidentiary rulings, and instruct the commission regarding the applicable and proper law to be followed in arriving at their assessment:

Specifically, the duties of the court, in the absence of a jury, are initially to appoint the commissioners, administer the oath of office to them, fix the time and place of their first meeting, instruct them in writing as to their duties and, at the conclusion of the testimony, instruct them in writing as to the applicable and proper law to be

---

3. The court of appeals affirmed the trial court's ruling that the 1987 Annexation Agreement did not require a dedication for E–470. E–470 filed a Petition for a Writ of Certiorari on the dedication issue and Hellerstein filed a Cross Petition on the damages to the remainder issue. We denied E–470's Petition and granted Hellerstein's Cross Petition. Thus, we do not address the dedication issue in this opinion.

4. "In all cases in which compensation is not made by the state in its corporate capacity, such compensation shall be ascertained by a board of commissioners of not less than three disinterested and impartial freeholders pursuant to section 38–1–105(1) or by a jury when required by the owner of the property as prescribed in section 38–1–106." § 38–1–101, 10 C.R.S. (2001).

followed by them in arriving at their ascertainment. The court shall upon request make rulings upon the propriety of the proofs and objections of the parties.

*Bd. of County Commr's v. Vail Assocs.*, 171 Colo. 381, 391–92, 468 P.2d 842, 847–48 (1970).

■ The role of the commission is to ascertain the present, reasonable market value of the property. *Goldstein v. Denver Urban Renewal Auth.*, 192 Colo. 422, 424, 560 P.2d 80, 82 (1977); *Stark v. Poudre Sch. Dist. R–1*, 192 Colo. 396, 398, 560 P.2d 77, 79 (1977)("The role of the commission is simply to determine the true market value."). The commission must consider any competent evidence that a prospective seller or buyer would consider as tending to affect the present market value of the land, apart from those factors precluded by the trial court. *Goldstein*, 192 Colo. at 425, 560 P.2d at 83. The commission determines what weight to give the evidence. *Id.* at 427, 560 P.2d at 84. Nevertheless, the commissioners must confine their evaluation of the market value of the property to the evidence before them. *Stark*, 192 Colo. at 399, 560 P.2d at 80.

■ At the valuation trial, the property owner bears the burden of proving, by a preponderance of the evidence, the basis and amount of any damages to its remaining property caused by the taking. *Troiano*, 170 Colo. at 491, 463 P.2d at 451 ("The property owner had the burden of proof with regard to establishing the existence of damages and the amount of compensation therefor."). Mere depreciation in value alone does not amount to grounds for awarding compensation. *City of Northglenn v. Grynberg*, 846 P.2d 175, 179 (Colo.1993)("In no case has mere depreciation in value been grounds to award just compensation for a damaging of property."); *La Plata Elec. Ass'n*, 728 P.2d at 698 (holding that the proper measure of compensation for damages to the remainder property is "the reduction in the market value of the remaining property that is *caused by the taking* ")(emphasis added).

■ There must be competent evidence in the record to show that the taking caused the depreciation in value. *La Plata*

*Elec. Ass'n*, 728 P.2d at 698; *City & County of Denver v. Hinsey*, 177 Colo. 178, 181–82, 493 P.2d 348, 350–51 (1972)(reversing damages awarded in condemnation proceedings where, even though jury was properly instructed, there was no admissible evidence supporting the damages award). Once the property owner has met its burden of showing that the condemnation project caused the depreciation in value to the remainder property, then the compensation owed for damages to the remainder property is measured by the reduction in the remainder's market value resulting from the taking, offset by the amount of any special benefits. *La Plata Elec. Ass'n*, 728 P.2d at 698.

■ The commission's certificate of ascertainment and assessment is accorded the same degree of deference as a jury verdict. *Aldrich v. Dist. Court*, 714 P.2d 1321, 1324 (Colo.1986). We do not set aside the commission's valuation determination unless the amount of the award is clearly inadequate or excessive as a matter of law.

■ Where an award of damages is manifestly excessive in light of the evidence presented, a court has the power under C.R.C.P. 59 to grant a new trial or, in the alternative, to deny a new trial on the condition that the plaintiff agree to a remittitur of the amount of damages found to be excessive. C.R.C.P. 59; *Burns v. McGraw–Hill Broad. Co.*, 659 P.2d 1351, 1356 (Colo.1983); *Mortensen v. Mortensen*, 135 Colo. 167, 168, 309 P.2d 197, 198 (1957)(holding that a commissioners' report in an eminent domain proceeding, unsupported by any findings and based on undisputed evidence, does not bind the court). A remittitur is permissible where excessive damages are not the result of passion or prejudice. *Burns*, 659 P.2d at 1356.

■ We review the case before us to determine whether the commission's award for damages to the remainder property was supported by the evidence. A commission's award of damages will be set aside only where no credible evidence supports it:

> In the face of conflicting evidence, the appellate court will generally refuse to modify the decision, as long as there is some credible evidence in the record to

support it. The court will not, so long as the award is within the range of credible testimony, reweigh the evidence or retry the facts. Where, however, the amount of the award is not supported by any evidence and is, in fact, contrary to the evidence adduced at the trial, the appellate court may set aside the award even though it is based in part upon a view of the premises by the trier of the facts.

5 Julius L. Sackman, *Nichols on Eminent Domain*, § 17.1[4], 17–14 to –21 (3d ed.2000). In examining the sufficiency of the evidence, we must also consider whether the condemnee met its burden of proof to demonstrate the existence, cause, and amount of damages to the remainder property. *Troiano*, 170 Colo. at 491, 463 P.2d at 451.

■ "We defer to the trial court's findings of fact and conduct de novo review of its legal conclusions." *Fowler Irrevocable Trust 1992–1 v. City of Boulder*, 17 P.3d 797, 802 (Colo.2001).

■ Whether sufficient evidence supports the damage award, and whether the condemnee has met its burden of proof with regard to establishing such damages, are matters of law we review de novo.

### B.

Damages to the Remainder Property Award

We therefore review the valuation hearing record to determine whether credible evidence supported the commission's assessment. We conclude that the evidence did not support the commission's award for damages to the remainder property, and was excessive as a matter of law.

■ At the valuation hearing, Hellerstein had the burden of proof to establish: (1) the existence of damages to the remainder property; (2) the E–470 Highway project caused these damages; and (3) the amount of compensation owed. *La Plata Elec. Ass'n*, 728

P.2d at 696–97; *Troiano*, 170 Colo. at 491, 463 P.2d at 451. We conclude that Hellerstein did not meet its burden of proof in regards to the $2.88 million awarded for damages to the remainder property. Other than the $100,000 cost to redo the development plan, Hellerstein identified no compensable, quantifiable damages to the remainder property unrelated to loss of access, a damage factor that was held inadmissible by the trial court.

### 1. Existence of Damages

■ Hellerstein asserts that the damage award could be attributed to loss of visibility. We disagree. We find nothing in the record to support an assessment of $2.88 million in damages based upon lack of visibility. Although one of Hellerstein's experts, Mr. Peterson, mentioned loss of visibility as a factor that could diminish the remainder property's value, he did not assign a dollar figure to this factor. Furthermore, when first asked what factors were important in analyzing the after-taking value of the remaining property, Mr. Peterson did not even mention loss of visibility.

The two E–470 witnesses who addressed the property's visibility both concluded that visibility was either unchanged or improved by the construction of the E–470 Highway. Mr. Ross, the design engineer, testified that the visibility of the property from E–470 would constitute an improvement to the before-taking visibility from Gun Club Road.[5] Mr. Hegarty, E 470's expert witness, concluded that visibility of the property was improved by the construction of the E–470 Highway, and included increased visibility as one of the specific benefits bestowed on the remainder property by the E–470 project.[6]

Hellerstein argues that because E–470's expert downgraded a completely different property by $9,168 per acre due to loss of visibility, the commission could have used this as evidence to support the $2.88 million

---

5. MS. OBERNEYER (E–470's Attorney): Mr. Ross, could you express your opinion please?
 MR. ROSS: Yes. My opinion is that after the project is constructed, the visibility of the property from E–470 certainly constitutes an improvement to what was there before.

6. Mr. Hegarty testified that the remainder property received $281,000.00 in special benefits as a result of the E–470 Highway project.

in damages awarded to the Hellerstein property.[7] This argument is unpersuasive. E–470's expert, Mr. Hegarty, testified that loss of visibility was not the primary factor in making the downward adjustment in value to the other property, rather it was due to several factors, including zoning, readiness for development, platting, interchange, and visibility:

MR. OPPERMAN (Hellerstein's Attorney): So you were trying to make a comparison between L–1, which is Gateway III, and your sale number 1, correct?

MR. HEGARTY: Yes.

MR. OPPERMAN: You first adjusted the 22,000—or the 9,000 discount for the location of L–1 next to the interchange, correct?

MR. HEGARTY: No. And that's your mischaracterization. There were other factors that caused me to adjust that a little bit. I was trying to narrow in, if I could, given the sales data, on the increase in value as you move east towards the developed areas of town. Sale—the Gateway III that you refer to, there were portions of it that were zoned for immediate development, had infrastructure and those type of things. I was trying to eliminate that. It's not just an interchange that I tried to reduce that for. I was just trying to back out a little bit, if I could, of the fact that additional infrastructure and the fact that it was ready for development. And that's what's classified as my visibility at I–70 interchange at that point.

Moreover, the entire discussion involving the downgrading of the other property was in relation to sale number 1, a sale that was not significantly related to the valuation of the Hellerstein property. E–470's expert testified that sale number 1 was only included for instructional purposes to demonstrate that the more developed property areas around 225 and the Stapleton/DIA industrial base are significantly more valuable than the less developed areas on the eastern side of the Denver metro area:

MR. DUNCAN (E–470'S Attorney): All right, sir. And do you rely upon sale number 1?

MR. HEGARTY: Sale number 1 was included for instructional purposes. That's a parcel of land that's located directly south of Front Range Airport along I–70 at Quail Run Road that is designated as a future interchange along I–70, but at the present time there's no interchange there. It was used to demonstrate that there's a significant increase in the value as you move from the less developed areas on the eastern side of the metro area to the more developed areas around 225 and the Stapleton/DIA type industrial base.

MR. DUNCAN: Mr. Hegarty, what I'd like you to do now is go through each of your sales now, 2, 3, 4, and 6 on the chart, and on the analysis of comparable land sales, if you'd tell me the buyer and the seller and the date of sale.

The testimony of E–470's expert does not support the $2.88 million award for damages to the remainder property.

Despite the trial court's contrary *in limine* ruling, Hellerstein's attorney elicited testimony from one of its expert witnesses, Mr. Peterson, regarding the fact that lack of access affected the after-taking value of the remainder property. Mr. Peterson testified that the remainder property was damaged in potential loss of highest and best commercial use and development potential. However, this testimony was directly related to loss of access. Mr. Peterson testified that the higher density of development contained in the 1987 Annexation Agreement was approved because of the "excellent access onto I–70 at Gun Club Road."[8] Furthermore, Mr. Peterson's testimony regarding potential loss of highest and best commercial use was immediately interrupted by an objection made by

---

7. The commission awarded damages to the residue in the amount of $2,888,272.80 or $9,827/acre for each of the 293.9 acres.

8. MR. PETERSON: I found they were allowed to develop higher density or higher FARs in this plan and specifically there's a memo that states that it's because of the excellent access onto I–70 at Gun Club Road.

E-470's attorney based upon the inadmissibility of loss of access evidence. The commission then requested a ruling by the trial judge. The trial judge reiterated his *in limine* ruling barring all lack of access evidence, and the testimony was stricken from the record. When the valuation hearing resumed, Hellerstein's attorney asked Mr. Peterson to state what factors he considered in determining the after-taking value of the property, excluding those factors related to loss of access. In response, Mr. Peterson did not mention potential loss of highest and best commercial use, nor did he mention loss of development potential. The only factors Mr. Peterson identified which were unrelated to loss of access were loss of visibility and the cost to replan the remainder property:

> MR. OPPERMAN (Hellerstein's attorney): Can we have just a moment? Mr. Peterson, in considering the value of the residue in the after condition were there factors that you took into consideration which do not include any of the prohibited factor as ruled on by the Court?
>
> MR. PETERSON: Yes, there were.
>
> MR. OPPERMAN: Where were those?
>
> MR. PETERSON: Well, one was there will be some costs to replan for this property, considering that there will be a portion of it lost. Another one is that moving this property or moving the residue back from I-70 makes it a little less visible. That visibility is also affected by the fact that E-470 has been raised considerably higher and buildings that would have been here (indicating) in this accommodation, this commercial part of the property in particular, maybe in this part, are not going to be as visible from vehicles westbound on I-70. So there's a loss of visibility. That's from two points

of view and there is a planning aspect that has to be met, costs that have to be met.

Thus, although Hellerstein's expert, Mr. Peterson, mentioned a loss of visibility, neither he nor any other witness offered any opinion or evidence regarding whether this loss caused damage to the remainder property and, if so, the amount of damages.

Hellerstein's attorney also introduced a significant amount of evidence regarding the inadequacy of access provided by Smith Road.[9] In addition, even though the trial court instructed the commission that any damages arising from loss of access were not compensable, one of the commissioners questioned Hellerstein's expert regarding the lack of access to the remainder property.[10] Any evidence regarding lack of access cannot support the commission's damage assessment because the trial court ruled as a matter of law that this damage factor was not compensable, and that ruling was not appealed. The only evidence presented at the hearing to support a finding that the remainder property was damaged was the expert testimony that it would cost $100,000 to redo the planning and zoning of the remainder property.

### 2. Causation

 In valuation proceedings, compensation is due if the evidence supports a finding that a diminution in market value *caused by the taking* has occurred. *La Plata Elec. Ass'n*, 728 P.2d at 703. It is not enough to show that the remainder property was damaged; the property owner must show that the condemnation caused this damage.

In his closing argument, Hellerstein's counsel advised the commission to ascertain

---

9. E-470's attorney objected to the introduction of any evidence regarding lack of access; however, the trial judge was not present for the valuation hearing and only the commissioners can request a ruling by the trial judge, thus the commission admitted the evidence.

10. COMM. HEPP: I just have one more question, it's about access, I hope I'm not out of order. I'm just curious now, where is the access to this property as it's developed in the future or where do you think it will be?

MR. PETERSON: Well, the access will have to come from Smith Road and from Picadilly or from the intersection of Picadilly and Smith Road no matter how you get there. And then there is access today but I believe it's access that can be shut off from E-470 on the east side of E-470 and it goes up to Smith Road, it's called Smith Way. And then, again, I feel it's questionable.

damages by mechanically subtracting the E–470 expert's after-taking valuation of the property from the Hellerstein experts' before-taking valuation. He sought to discredit the E–470 expert's before-taking valuation, yet he urged the commission to accept this same expert's after-taking valuation. Hellerstein argues that this method of damage computation is legally correct and supported by the evidence in this case. We disagree.

■ The proper measure of compensation for damages to the remainder property is "the reduction in the market value of the remaining property that is *caused by the taking*," offset by the amount of any special benefits accrued due to the condemnation project. *La Plata Elec. Ass'n*, 728 P.2d at 698 (emphasis added). There must be some evidence linking the before-taking and after-taking property valuations to the condemnation project; here, other than the $100,000 replanning cost, there was none. Of itself, valuation evidence does not prove the condemnation project in particular caused the depreciation in property value. *Id.* Causation of damages is a determination that cannot be made solely on the basis of valuation evidence; the property owner must present evidence demonstrating that the condemnation caused the depreciation in property value. *Id.*

Here, the award is not accompanied by sufficient evidence to demonstrate that the difference between the before-taking valuation of the remainder property, provided by Hellerstein's experts, and the after-taking valuation, provided by E–470's expert, was caused by the E–470 Highway project. The only evidence linking damages to the remainder property to the E–470 Highway project was in regard to the $100,000 cost to replan the remainder property.

### 3. Amount of Compensation Due

■ In making its assessment, the commission could not have determined whether E–470's condemnation caused compensable damages in any amount greater than $100,000, because there was no evidence presented to them to support such a finding. Although Hellerstein's experts testified to a before-taking value, they did not identify any quantifiable damages caused by the E–470 Highway project, nor did they assign a depreciated after-taking value to the remainder property. E–470's expert testified to a before-taking and after-taking value, but these valuations were based upon his conclusion that the remainder property had not been damaged at all, and had in fact increased in value due to the E–470 Highway project.

From the record, it appears that the commission incorrectly combined incompatible valuation testimony (Hellerstein's before-taking value and E–470's after-taking value) to produce a damages amount. The only after-taking value presented to the commission came from E–470's expert, who found that *no damages* occurred to the property in question. Thus, the valuation evidence before the commission clearly did not show that the remainder property suffered a depreciation in value due to the E–470 Highway project. The commission's assessment yielded a "damages" figure of millions of dollars where no expert testified to damages of more than $100,000.

### III.

We hold that the $2.88 million award for damages to the remainder property had no support in the evidence and was excessive as a matter of law. Other than the $100,000 cost to redo the development plan, Hellerstein failed to identify any compensable, quantifiable damages to the remainder property caused by E–470.

Accordingly, we affirm the court of appeals' judgment directing the trial court to offer Hellerstein the option of a remittitur, or, if Hellerstein does not accept the remittitur, to order a new trial on the amount of compensation due for damages to the remainder property. We return this case to the court of appeals for remand to the trial court for further proceedings consistent with this opinion.

Justice KOURLIS dissents, and Justice BENDER joins in the dissent.

## 1162 ▪ ▪

Justice KOURLIS dissenting.

Because I believe that the majority is improperly substituting its factual determinations for those of the commission, and therefore failing to afford appropriate deference to the commission, I respectfully dissent.

### I. Facts

This is an eminent domain proceeding brought by E–470 to acquire a portion of the Hellerstein property. The entire Hellerstein property consisted of approximately 351 acres, which had been annexed and planned in 1987 by the City of Aurora as a designated commercial office and industrial use area under a Master Plan. The property is located at the interchange of Gun Club Road and Interstate 70.

E–470 (Authority) filed a Petition in Condemnation as to 62 acres claimed in fee, 11.3 acres in permanent easements, and 1.3 acres in construction easements. The acquisition took most of the designated commercial land and left the industrial uses and some office uses.

There were two significant legal issues in dispute during the proceeding: the first was whether the Annexation Agreement with the City of Aurora required Hellerstein to dedicate the necessary property without compensation. The trial court ruled in favor of the landowner on that issue; the court of appeals agreed, and we did not accept certiorari on that issue.

The second issue was whether Hellerstein could present evidence concerning the impairment of access to the remaining property that would be caused by the taking. Hellerstein offered evidence at an in limine hearing that the E–470 project would eliminate access from the property to Gun Club Road. The Gun Club Road access was a part of the general development plan for the property and was designed in such a way that the future development of the property would include an easy access to I–70. The access for the property after the taking was Smith Road. Hellerstein argued that Smith Road was not a public road, and that, therefore, it could not be relied upon for consistent access. The trial court concluded that Smith

Road was "going to be there for a long time" and, accordingly, that the E–470 project did not substantially impair access to the remainder of the Hellerstein property. Hence, the court held that Hellerstein could not present evidence on compensation related to access. That issue was not appealed.

The hearing on damages went forward before a duly-appointed commission of landholders as required by section 38–1–101, 10 C.R.S. (2001). The commission found the value of the property taken was $1,323,691.15, and damages to the residue were $2,888,272.80, with a special offset benefit of $297,000. The trial court denied the Authority's motions for post-trial relief, denied Hellerstein's motion for attorney fees, and entered judgment in accordance with the commission's findings.

At the damages hearing, the landowner put three experts on the stand in the case-in-chief. Because the court's ruling that the experts could not testify about damage caused by the change in access came just before the trial was scheduled to begin, the landowner's experts were not prepared to separate out damages caused by access impairment and other kinds of damages to the remainder. As a result, the landowner's experts did not explicitly assign a value to damage to the remainder of the property, with the exception that one expert stated it would cost $100,000 to redo the planning and zoning of the property.

On the other hand, the landowner did present evidence that there was damaging impact to the remainder of the property caused by the taking. Specifically, one of the landowner's experts testified that the taking caused the remainder to be moved back from the I–70 interchange and caused a loss of visibility to the remainder. Maj. op. at 1160. Such testimony was not subject to any preclusion regarding access and was introduced without objection and as a factor unrelated to the loss of access. Maj. op. at 1160.

During cross-examination of the Authority's expert, the landowner's attorney elicited testimony about damage to the remainder of the property due to the taking. That expert testified that he had down-graded a piece of property that he used for determining com-

parable sales for purposes of valuing the taking because of loss of visibility to I–70 and an interchange. Specifically, he adjusted the property downward by $9,168 per acre because of those two factors. The questions and answers were:

Q: And the first step in your analysis that you did was to take sale number 1, L–1, which was the location at the southwest corner of Peña Boulevard or Buckley and I–70, that particular transaction, and adjusted for the corner location; did you not?

A: I adjusted it for visibility to I–70 and the interchange, yes.

Q: And that adjustment that you made was a downward 25 percent, correct?

A: Correct.

Q: Or, $9,168 per acre, correct?

A: Correct.

The commission ultimately found the value of the property before the taking to be between $18,324 per acre and $21,735 per acre.

The commission also awarded damages to the residue in the amount of $2,888,272.80 or $9,827 per acre for each of the 292.9 acres.

In arriving at that determination, the commission was guided by the stipulated instructions of law given by the trial court. Specifically, the instructions directed the commission to determine the amount of compensable damages (Instruction No. 1) by holding Hellerstein to a preponderance of the evidence burden of proof, regardless of which party may have produced such evidence (Instruction No. 9). The commission understood that they were the sole judges of the facts and of the credibility of witnesses (Instruction No. 10), as well as of the weight to be assigned to an expert opinion (Instruction No. 11).

More specifically, two complete instructions addressed the determination of compensable damages, if any, and the value of specific benefits, if any, to the residue of the property.[1] Those instructions directed the

1. In full, those instructions read as follows:

Instruction No. 5

You are also to determine the amount of compensable damages, if any, and the value of specific benefits, if any, to the residue of the Hellerstein/Farkas property and, after having determined any such damages or benefits, you should state the amount of any damages in your certificate and the amount and value of any benefits in your certificate.

"Residue" means that portion of any property which is not taken but which belongs to the Respondents, Stephen A. Hellerstein, Trustee; Stephen A. Hellerstein, Successor Trustee to L.A. Hellerstein, Trustee; and Howard L. Farkas, and which has been used by, or is capable of being used by, the Respondents, together with the property actually taken, as one economic unit.

Any damages or benefits are to be measured by the effect the acquisition of, and the expected uses of, the property actually taken has on the reasonable market value of the residue. Any damages are to be measured by the decrease, if any, in the reasonable market value of the residue, that is, the difference between the reasonable market value before the property actually taken is acquired and the reasonable market value of the residue after the property actually taken has been acquired. Any damages which may result to the residue from what is expected to be done on land other than the land actually taken from the Respondents and any damages to the residue which are shared in common with the community at large are not to be considered.

Similarly, any benefits to the residue are to be measured by the increase, if any, in the reasonable market value of the residue due to the construction of the E–470 Highway. For anything to constitute a specific benefit, however, it must result directly in a benefit to the residue and be peculiar to it. Any benefits which may result to the residue but which are shared in common with the community at large are not to be considered.

Nothing should be considered as a factor of damages or benefit unless you find that it increases or decreases the reasonable market value of the residue.

Any finding of damages or benefits to the residue shall not affect your determination of the value of the property actually taken.

You should determine any damages or benefits as separate, independent items. You should not attempt to balance the two. Any adjustment or balancing must be done by the court.

Instruction No. 6

In order for you to determine damages to the residue, you must find that the residue itself has been or will be damaged by some diminution in its reasonable market value, either as a result of its being severed from the land actually taken or because the adjacent public use on the land actually taken from the Respondents, but not on other land, will render the residue less valuable.

Infringement of the owner's personal pleasure or enjoyment in the use of the residue or even the owner's annoyance or discomfort do not constitute compensable damages. Neither does the fact that the residue may be less

commission to determine if the E–470 taking caused damages to the remaining Hellerstein property (Instructions Nos. 5 and 6) and to measure those damages, if any, by the difference between the value of the property before and after the taking (Instruction No. 5). Damages were to be measured by the effect of the acquisition of, and the expected uses of, the property actually taken on the market value of the residue (Instruction No. 5). Lastly, the instructions prohibited the commission from considering that the remainder of the property might be less desirable for certain purposes, or less enjoyable to the owner. Rather, damage to the remainder of the property could only arise out of the natural, necessary, and reasonable results of the taking and a measurable reduction in value. The instructions noted that the court had determined, as a matter of law, that the commission could not award damages arising from loss of access to Gun Club Road.

## II. Deference and Presumptions

As the majority notes, maj. op. at 1157, we afford the same degree of deference to a condemnation commission's certificate of ascertainment and assessment as we do to a jury's verdict. *Aldrich v. Dist. Ct.*, 714 P.2d 1321, 1324 (Colo.1986). Such award can only be set aside by a reviewing court if *no credible evidence* supports it, and it is, in fact, contrary to the evidence adduced at trial. Maj. op. at 1157–1158.

Our case law is clear and consistent in holding that an appellate court may not set aside a jury verdict if the jury has been properly instructed and there is competent evidence from which the jury could have arrived at its conclusions. In *Fowler Irrevocable Trust 1992–1 v. City of Boulder*, 17 P.3d 797 (Colo.2001), we upheld the portion of a condemnation award that concerned restoration costs to remainder property on the basis that "[w]e will not set aside jury awards if they are based on the evidence and

the instructions have not misled the jury." *Id.* at 806. In *Bohrer v. DeHart*, 961 P.2d 472, 476 (Colo.1998) we held that "we do not set aside a jury verdict unless the court's error is inconsistent with substantial justice." *See also Stewart v. Rice*, 47 P.3d 316 322 (Colo.2002) (citing *Bohrer*, 961 P.2d at 477 ("We defer to jury verdicts when jurors have been properly instructed and the record contains evidence to support the jury's findings.")); *Hock v. N.Y. Life Ins. Co.*, 876 P.2d 1242, 1259 (Colo.1994).

In short, as a reviewing court, we honor the jury verdict provided that the jury received correct instructions of law—which is not at issue here—and provided that the verdict is supported by evidence in the record.

## III. Evidence of Diminution in Value

The majority does not adopt the court of appeals' rationale that a condemnation award cannot be based simply on the difference between the before-taking value assigned by one side's witness and the after-taking value of the other side's witness. *E–470 Pub. Highway Auth. v. Jagow*, 30 P.3d 798, 805 (Colo.App.2001) (citing *Genge v. City of Baraboo*, 72 Wis.2d 531, 241 N.W.2d 183 (1976)). However, the majority does conclude that there was no evidence linking the before-taking and after-taking property valuations to the condemnation project other than the $100,000 replanning cost. Maj. op. at 1160–1161. The majority cites *La Plata Electric Ass'n v. Cummins*, 728 P.2d 696 (Colo.1986), for the proposition that there was not sufficient evidence to demonstrate that the difference in value was caused by the taking.

*La Plata* concerned the propriety of awarding damages to the remainder of a landowner's property occasioned by the taking of a power line easement. *Id.* at 696–97. The dispute centered on whether the reduction in market value of the remainder was recoverable or whether it was identical in

---

desirable for certain purposes. Such matters are not compensable except as they are a natural, necessary and reasonable result of the residue being severed from the land actually taken or of the uses expected to be made of the land actually taken, and are measurable by a reduction in the market value of the residue.

The Court has determined, as a matter of law, that any damages arising from the loss of access to Gun Club Road are not compensable and shall not be awarded by you.

kind to that suffered by the community at large and therefore not recoverable. *Id.* at 698. The court held that "the very nature of a power line—which generally runs for some distance across or near various properties from which it can or must be seen—necessarily causes … adverse aesthetic effect." *Id.* at 700. Hence, the court upheld damages based upon a reduction in property value:

> For the foregoing reasons, we hold that when a portion of a parcel of land is taken from a property owner in a condemnation proceeding, that landowner is entitled to recover all damages that are the natural, necessary and reasonable result of the taking, as measured by the reduction in the market value of the remainder of the property. The property owner is entitled to present any relevant evidence concerning diminution of market value caused by the taking. *If the evidence supports a finding that a diminution of market value has occurred, compensation must be awarded.*

*Id.* at 703 (emphasis added).

I do not dispute that the taking must have caused the damage, although I would suggest that evidence of value before the taking and after the taking showing a reduction in value could be circumstantial evidence of such causation.

Here, I suggest that the majority is resolving factual disputes appropriately left to the commission. Specifically, there is evidence that the taking damaged the property's visibility from I–70. The trial court's ruling did not preclude evidence on that issue. The landowner obtained testimony from the opposing expert that a loss of visibility would cause damage to the remainder of the property, and that such damage could be quantified. Whether that evidence was persuasive or credible is an issue left to the discretion of the commissioners—it appears in the record, and is some support for the commissioner's conclusion.

Admittedly, the landowner's attorney did not tie all of the evidence together either in opening or closing, but that goes to oratory, not to proof. The evidence existed in the record from which the commission could have concluded that the remainder was damaged by the taking, in the specific amount found in the certification.

Remembering that we uphold a condemnation award when the instructions of law are correct and there is some evidence in the record to support the award, I believe this award should be upheld.

In my view, there is sufficient evidence in the record to support a determination by the commissioners that the taking caused damage to the remainder of the property. Further, there is evidence in the record supporting a before-taking valuation of the remainder that was approximately $9,000 per acre greater than the after-taking valuation.

### IV. Conclusion

Accordingly, the award of the commissioners deserves the deference we normally afford such findings by a jury. Because I believe the majority has failed to adhere to that standard of deference, I respectfully dissent.

I am authorized to state that Justice BENDER joins in this dissent.