**In the Matter of Jerold Lewis TRUPP, Attorney–Respondent.**

No. 03SA344.

Supreme Court of Colorado, En Banc.

June 28, 2004.

Jaudon & Avery, L.L.P., Joseph C. Jaudon, David H. Yun, Denver, Colorado, Attorney for Petitioner.

Michael D. Gross, Colorado Springs, Colorado, Attorney for Respondent.

Chief Justice MULLARKEY delivered the Opinion of the Court.

## I. Introduction

This is the second time that this attorney regulation case has come before this court. In the prior decision, *People v. Trupp* ("*Trupp I*"), we held that: Colorado Rule of Civil Procedure 11(a) applies to attorney regulation proceedings; the presiding disciplin-

ary judge has exclusive authority over a C.R.C.P. 11(a) motion; and only the assistant attorney regulation counsel who signed the complaint is answerable to the motion. 51 P.3d 985 (Colo.2002). In that earlier case, we did not decide whether the assistant attorney regulation counsel had violated Rule 11(a). Instead, we remanded the case to the presiding disciplinary judge, emphasizing that only in the rarest of circumstances will a Rule 11(a) sanction be appropriate in an attorney regulation case.

Upon remand, the presiding disciplinary judge ruled that the assistant attorney regulation counsel, Teresa Garcia, violated Rule 11(a) when she advanced the claim that attorney Jerold Lewis Trupp violated Colorado Rule of Professional Conduct 8.4(c). We now reverse the decision of the presiding disciplinary judge, and hold that there is not evidence to support the finding that Garcia violated Rule 11(a) when she filed charges against Trupp.

## II. Facts and Procedural History

Under the rules governing the practice of law in Colorado, every attorney must pay an annual registration fee to defray the costs associated with functions such as attorney regulation, continuing legal education, and client protection. C.R.C.P. 227(A)(1). In addition, each attorney must provide certain information under oath or affirmation. C.R.C.P. 227(A)(2). As relevant to this case, each attorney must state whether he or she is subject to a child support order and whether the attorney is in compliance with any such order. C.R.C.P. 227(A)(2)(a)(4).

Jerold Lewis Trupp first came to the attention of the Office of Attorney Regulation Counsel in early 2001. Trupp had indicated on his attorney registration forms for 2000 and 2001 that he was not in compliance with his child support obligations.[1] In an attempt to mitigate this admission, Trupp wrote on both forms: "but I have taken measures to pay back child support."

After receiving these forms, the intake division of the Office of Attorney Regulation Counsel initiated an investigation to determine whether there appeared to be a violation of the Rules of Professional Conduct. Pursuant to this inquiry, an intake investigator spoke with Trupp on January 16, 2001. The investigator's contemporaneous notes stated: "there is no child support order, but he [Trupp] will send me payment plan etc. He made a bad investment (he is 62) and now will have social security pay his child support. He needs t[w]o weeks to get documents to us." The investigator's notes also said that Trupp's " 'measures' and payment plan do not appear to be court approved. PROCESS for further investigation." Trupp never provided the documents he promised.

On February 1, 2001, the case was transferred from intake to Teresa Garcia, an assistant attorney regulation counsel with the trial division. Garcia had started working for the Office of Attorney Regulation Counsel only days prior to being assigned the case. Garcia reviewed the intake file and requested further information from Trupp. In March, Trupp responded with a letter explaining that the Jefferson County District Court had entered a child support order requiring him to make $350 monthly payments and that he was in arrears in the amount of $3,668.[2] He then wrote:

> I stated in my answer to the Attorney Registration Office that I have taken measures to pay back child support.... In August, 2000, I went on Social Security, and my son began receiving $576.00 per month. The child support order provides for $350.00 per month. He, therefore, is receiving $226.00 per month in excess of the order, which is being applied for the back child support. In 16 months, his child support amount will be current; and the child support being paid will be $226.00 more than the current order.

In response, Garcia continued her inquiry, asking her investigator to obtain relevant

---

1. Trupp filed the forms for both years on the same day in January 2001.

2. Although Trupp indicated that he was obligated to pay $350 per month, this was incorrect. The

court order actually required that he pay $250 in child support and an additional $50 to make up for arrearages—a total monthly obligation of $300.

court records and to interview the mother of Trupp's child. The investigator obtained Trupp's complete child support payment record from the court registry, spoke with the mother of the child more than once to confirm the payments, reviewed the paternity file, and determined the total payments Trupp had made. The investigator then calculated that Trupp owed $2,204.57 in back child support, including twelve percent interest. Garcia reviewed all of this information.

In the meantime, Garcia interviewed Trupp, who has experience as an attorney representing clients in domestic relations cases. He informed her that "he had never been able to pay the child support . . . in the amount that had been ordered on the due dates." He told Garcia that he had not sought to have the order modified because he believed his son was "worth $350 a month, so that amount is okay." He further said that he did not believe that it was a problem to be under a court order that he could not satisfy, and did not have any plans to seek modification to the order or to otherwise improve his ability to pay. Finally, Trupp explained what he meant when he said he had taken "measures" to satisfy his back child support payments. He said that he had applied to receive social security retirement benefits, and that as an automatic component of Trupp's benefits, his son would directly receive $576 per month—$226 more than the court order required, according to Trupp's calculations. Trupp did not, however, agree to seek modification to his child support order to apply these payments to his legal obligations.

After this conversation, Garcia contacted the social security office. She learned that Trupp had started receiving benefits in August 2000. She also learned that Trupp's child automatically began receiving benefits when Trupp did. An employee of the social security office, however, told Garcia that the social security payments to the child did not reduce either Trupp's child support obligations or Trupp's own social security benefits. After this conversation, Garcia noted in a written memo to the file that "[the child] gets 576.00 per month since August 2000—

[Trupp] thinks this will be applied to child support arrearages."

Finally, Garcia conducted legal research on the issue of whether the social security payments eliminated Trupp's obligations under the child support order. During her research, she interpreted *In re Marriage of Wright* to hold that a court must modify the child support order before social security benefits can legally reduce the amount of support that must be paid to the child by the parent. 924 P.2d 1207 (Colo.App.1996). She concluded that under *Wright,* Trupp was obligated to continue making $300 monthly payments until he obtained a modification of the court order to substitute the social security payments. She also understood that case to hold that the parent's obligations could only be reduced prospectively from the date when the motion for modification was filed.

In early April 2001, Garcia telephoned Trupp to inform him of the *Wright* case, and told him that he needed to comply with the court mandated child support order. He responded: "I understand" and indicated that the following week he would address the matter with the court, and that he would call Garcia to update her. Trupp, however, never followed up with either the court or Garcia.

Then, on April 13, 2001, Garcia presented the Trupp case at a meeting of the intake and trial attorneys. In a memorandum she had prepared for the meeting attendees, Garcia stated that Trupp was currently in arrears in the amount of $2,204.57. Moreover, Garcia's memo urged that social security payments to a child are independent of a noncustodial parent's child support obligations until a court modifies the order so that the social security payments substitute for the noncustodial parent's obligations. Because Trupp had not obtained a new court order, Garcia claimed that the son's social security payments did not substitute for Trupp's court-ordered payments or reduce his arrearage. Finally, Garcia's memo stated:

> The respondent understands that the Social Security payments to his son do not impact or decrease the amount of his benefits. He realizes that the two are indepen-

dent of each other. Nevertheless, he stated that he figured that the Social Security payments to his son could be counted to make up for the respondent's arrearages on child support.

Thus, Garcia argued, because Trupp had not sought to modify the court order, he "has not taken any measures to pay by way of his Social Security benefits."

The attorneys at the meeting discussed and debated the case. Ultimately, they agreed that the next step was to file a petition for suspension of Trupp's law license pursuant to C.R.C.P. 251.8.5, which calls for the immediate suspension of an attorney who is behind in child support payments.

On May 23, 2001, the presiding disciplinary judge ("PDJ") held a hearing to determine whether Trupp should be suspended. At this hearing, Trupp admitted being behind in his payments by $850 and, as a result, the PDJ suspended his license to practice law. First, the PDJ noted that Trupp's admission that he was in arrears was sufficient to order an immediate suspension. Second, the PDJ reasoned that under *In re Marriage of Wright,* social security payments do not offset child support requirements until the parent files a motion for modification of child support, or until the payments go through the child support registry. The PDJ pointed out that Trupp had taken neither of these measures at the time of the hearing and consequently suspended him.

A suspension under C.R.C.P. 251.8.5 does not constitute a disciplinary proceeding, is not considered discipline, and does not bar disciplinary action. C.R.C.P. 251.8.5(1). Therefore, after Trupp's suspension, Garcia had the option to dismiss the disciplinary allegations against Trupp, divert the matter to the alternatives for discipline program, or present the case to the Attorney Regulation Committee to determine whether to file a formal complaint.

Garcia chose to submit the case to the Committee to decide whether there was reasonable cause to bring a formal complaint.

She proposed charging Trupp with violating Colorado Rules of Professional Conduct 3.4(c) ("knowingly disobey[ing] an obligation under the rules of a tribunal") and 8.4(c) ("engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation"). Garcia urged that Trupp had violated the first rule by failing to satisfy or modify the court order requiring him to make monthly child support payments of $300. She claimed that Trupp violated the second rule when he wrote on his attorney registration forms that he had taken measures to satisfy his prior child support obligations. In support of her arguments, Garcia presented the Committee with the report of the investigation to date.

After reviewing Garcia's recommendations and the report of her investigation, the Committee authorized the Office of Attorney Regulation Counsel to bring formal charges against Trupp. Pursuant to the Committee's approval, Garcia filed a formal complaint on June 29, 2001, and later amended it. The first claim [3] alleged that Trupp violated Colorado R.P.C. 3.4(c) by knowingly disobeying the Jefferson County District Court's Order requiring him to pay monthly child support. The second claim alleged that Trupp violated Colorado R.P.C. 8.4(c) by making misrepresentations to the Clerk of the Supreme Court in connection with paying his attorney registration fees. Before filing the complaint, Garcia submitted it to her superior, Nancy Cohen, who made minor editing changes, and then approved the document.

After the complaint was filed and prior to trial, Trupp entered into a stipulated agreement with the mother of his child, in which the two agreed that the social security payments would satisfy the child support payments that were due. The stipulated agreement was filed with the court and served to modify Trupp's child support order. It provided that the social security payments would cover the $250 monthly child support obligations and that the approximate remaining $330 of the payment would be applied toward arrearages. The stipulation was backdated

---

**3.** When we refer to the first and second claims against Trupp, we are referring to the claims in the amended complaint.

to August 2000, which was the date that the social security payments began.[4]

Before trial, Trupp made various motions to dismiss the charges against him, arguing that Rule 3.4(c) was unconstitutionally vague, that the first claim should be dismissed on summary judgment, and that the second claim failed to state a claim against him. The PDJ denied the motions and the case proceeded to trial.

At trial, Trupp contradicted his numerous prior admissions by claiming that he had never, since 1996, been behind on his child support obligations. Trupp further argued that when he wrote on his attorney registration form that he had "taken measures to pay back child support," he simply meant that he had applied for social security benefits that he knew would also provide support for his child. In sum, Trupp argued that he was never behind in child support payments, did not misrepresent his child support situation on his attorney registration form, and thus, was not guilty of either charge against him.

In support of the first claim, Garcia presented evidence showing that Trupp's child support payments were erratic and often late, and that he then owed over $2,000. The financial calculations that Garcia presented, however, turned out to be contradictory and inaccurate, and the hearing board fully discounted this evidence. Regarding the second claim, Garcia pointed out that Trupp did not take *legal* measures to apply the social security payments to his child support obligations until August 2001, long after he represented on his attorney registration form that he had "taken measures to pay back child support."

After the close of all the evidence, Trupp moved for a directed verdict pursuant to C.R.C.P. 50. The hearing board granted the motion, saying that no reasonable hearing

board could find by clear and convincing proof that the charges had been established. The dismissal of the first claim was based on the fact that during trial, the attorney regulation investigator was unable to fully explain discrepancies in a critical exhibit containing a list of Trupp's payments. Consequently, there was no persuasive evidence that Trupp was ever actually behind on his payments.[5] The dismissal of the second claim was based on Trupp's testimony that at the time he filed his attorney registration forms, he intended that the social security payments would cover his child support payments, although, as the PDJ noted, Trupp did not take legal action "as quickly as all of us would have liked...."

After the trial, Trupp filed a motion asking the PDJ to sanction Garcia, numerous other staff members of the Office of Attorney Regulation Counsel, and several members of the Attorney Regulation Committee under C.R.C.P. 11(a) ("Rule 11"). Rule 11 creates a duty upon every attorney to investigate and accurately represent both the facts and the law relevant to any pleading that that attorney files with a court. C.R.C.P. 11(a). It also forbids an attorney from filing a pleading for an improper purpose such as delay or harassment. *Id.* Trupp claimed that Garcia and others from the Office of Attorney Regulation Counsel violated Rule 11 by filing the complaint against him alleging that he had violated Colorado R.P.C. 3.4(c) and 8.4(c).

After Trupp's motion, the PDJ entered an order directing that the motion be set for an evidentiary hearing and stating that the requested relief under Rule 11 would only be considered as against Garcia and John Gleason, the attorneys whose names appeared on the complaint. The Office of Attorney Regulation Counsel appealed the PDJ's order, and

---

4. The first payment did not reach the child until January 2001, but this initial payment included six months worth of payments—August through January.

5. At neither the immediate suspension hearing, nor the disciplinary hearing did the PDJ make findings of fact regarding the amount of Trupp's child support arrearage. Thus, it is unclear when and by how much Trupp was behind in his payments. This confusion stems from Trupp's

erratic payment record, at least two modifications of the original court order, and some payments that were meant to reimburse the mother for her attorney fees.

Both at the immediate suspension hearing and at the attorney discipline trial, Trupp was able to discredit Garcia's calculations. Moreover, the mother, another lawyer, testified that she could not figure out whether Trupp was behind, and if so, by how much.

this court held that the charges could only be considered against Garcia, not John Gleason, and the PDJ had sole authority to conduct the hearing and decide the issue, rather than the entire disciplinary board. *Trupp I,* 51 P.3d 985 (Colo.2002). This court then remanded the matter to the PDJ, emphasizing that Rule 11 sanctions are only appropriate in the rarest of circumstances in attorney regulation cases. *Id.* at 992.

On remand, the PDJ conducted a hearing, which included several exhibits and the testimony of Garcia, Trupp, and the investigator. More than one year after this hearing, the PDJ issued a written decision, finding that Garcia had not violated Rule 11 when she alleged that Trupp had broken Colorado R.P.C. 3.4(c), which forbids "knowingly disobey[ing] an obligation under the rules of a tribunal." [6]

However, the PDJ did find that Garcia violated Rule 11 when she alleged that Trupp disobeyed Colorado R.P.C. 8.4(c) by "engag[ing] in conduct involving dishonesty, fraud, deceit or misrepresentation." The PDJ reasoned that Garcia was required to present proof that Trupp's misrepresentation was either reckless or deliberate, and he concluded that Garcia had no evidence whatsoever to this effect. Instead, the PDJ found, all of Garcia's investigation reflected that Trupp "believed that those measures taken were sufficient to have the portion of the social security in excess of the current child support payment to be credited toward any arrearage."

Because Garcia knew that Trupp did not have the requisite state of mind to violate R.P.C. 8.4(c), the PDJ continued, "Ms. Garcia's allegation that Trupp knowingly and intentionally made a misrepresentation regarding measures taken by him to pay back child support was not well-grounded in fact and was not an objectively reasonable interpretation of the facts developed in the investigation." The PDJ found that this constituted a violation of Rule 11. Moreover, the PDJ found that because Garcia did not reveal any evidence pertaining to Trupp's state of

mind to the Attorney Regulation Committee prior to filing the formal complaint, the ordinary checks and balances in the attorney regulation process did not insulate Garcia from a Rule 11 violation.

Nonetheless, the PDJ did not impose any sanction, saying that:

> Any ruling finding that a lawyer has violated C.R.C.P. 11(a) has consequences extending beyond that immediate case. Insurance rates can be affected, employment opportunities may diminish, and the lawyer's reputation is altered. Taking into account those adverse consequences, Ms. Garcia's lack of experience and the delay in resolving the motion, no additional sanction is required beyond that already suffered by Ms. Garcia as the result of this ruling.

Garcia now appeals the PDJ's holding that she violated Rule 11 when she alleged that Trupp violated Colorado Rule of Professional Conduct 8.4(c).

### III. Analysis

█ Because the PDJ's finding of a Rule 11 violation was based only on the second claim, we limit our discussion to that allegation. The second claim alleged that Trupp violated Colorado R.P.C. 8.4(c) by making misrepresentations to the Clerk of the Supreme Court when he stated that he had "taken measures to pay back child support." To determine whether Garcia violated Rule 11 when she filed this claim, we begin our analysis by describing the requirements of Rule 11 itself. Then, because Rule 11 requires that an attorney only advance charges that are well-grounded in fact and warranted by existing law or a good faith argument for the extension of the law, we examine whether Garcia conducted adequate research and whether she accurately represented both the facts and the law in the complaint. Ultimately, we hold that Garcia properly investigated the facts and the law, and that she properly represented both in her complaint. This is not one of those rare cases where the

---

**6.** This lengthy delay in ruling on the motion is unfortunate. We direct the PDJ to decide such issues promptly in the future.

attorney regulation counsel violated Rule 11. Thus, we reverse the PDJ's ruling against Garcia.

### 1. Rule 11

Rule 11 requires "that to the best of [the submitting attorney's] knowledge, information, and belief formed after reasonable inquiry, [the pleading] is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law...." C.R.C.P. 11(a). A Rule 11 inquiry focuses on pre-filing, pre-pleading behavior of the attorney, in light of an objective reasonableness standard. *Trupp I,* 51 P.3d 985, 991 (Colo. 2002). As we said in *Trupp I,* "[t]he C.R.C.P. 11(a) inquiry does not turn on the outcome of the case; instead, it turns on whether the attorney met the reasonable inquiry and proper purpose threshold in preparing and filing the pleading." *Id.* Bad faith is not a prerequisite of Rule 11 sanctions. *Stepanek v. Delta County,* 940 P.2d 364, 370 (Colo.1997). Instead, an attorney may violate Rule 11 simply by failing to conduct an objectively reasonable inquiry prior to filing a signed pleading. *Id.*

In *Trupp I,* we held that "the scope of the C.R.C.P. 11(a) inquiry in this case is limited to whether the attorney who signed the complaint and amended complaint: (1) read them; (2) undertook reasonable inquiry into them; and (3) possessed a proper purpose in filing them." 51 P.3d at 988. Because both parties in this case acknowledge that Garcia read the complaint and amended complaint, and that she did not harbor any improper purpose in filing them, we need only focus on whether Garcia conducted a reasonable inquiry prior to filing the complaints.

In *Trupp I* we further noted that "in view of the [Attorney Regulation] Committee's function to determine whether reasonable grounds for discipline exist, we observe that it will be a rare circumstance in which the attorney regulation counsel who signed a complaint or amended complaint is properly subject to a C.R.C.P. 11(a) sanction." *Id.* (citations omitted). This is because of the procedural safeguards that are part of the structure of the Office of Attorney Regulation Counsel.

Above, we described the process that Garcia followed as she prepared to file the complaint in this case. This procedure is standard, and indeed required by the Colorado Rules of Procedure Regarding Attorney Discipline. *See generally* C.R.C.P. 251.1 to 251.34. Prior to filing a complaint in an attorney regulation case, the attorney regulation counsel must submit both a report of investigation and a recommendation to the Attorney Regulation Committee. C.R.C.P. 251.12. The Committee consists of six lawyers and three members of the public. C.R.C.P. 251.2. It has the options of asking the attorney regulation counsel for further investigation, dismissing the allegations, diverting the matter to the alternatives to discipline program, ordering private admonition, or authorizing the regulation counsel to "prepare and file a complaint against the attorney." C.R.C.P. 251.12(a)-(e). In deciding whether a complaint should be filed the Committee must consider:

(1) Whether it is reasonable to believe that misconduct warranting discipline can be proved by clear and convincing evidence;

(2) The level of injury;

(3) Whether the attorney previously has been disciplined; and

(4) Whether the conduct in question is generally considered to warrant the commencement of disciplinary proceedings because it involves misrepresentation, conversion or commingling of funds, acts of violence, or criminal or other misconduct that ordinarily would result in public censure, suspension or disbarment.

C.R.C.P. 251.12(e). Thus, any complaint filed in an attorney discipline case must be investigated to the satisfaction of the Committee, the Committee must have reasonable belief that grounds for discipline exist, and the alleged infraction must be serious enough, in the Committee's opinion, to warrant a formal complaint rather than a private admonition or an alternative to discipline.

We now turn to the question of whether Garcia conducted a reasonable investigation

prior to filing the complaint against Trupp, and whether she accurately represented the facts and the law in the complaint. As discussed below, we hold that there is no evidence that Garcia failed to investigate either the facts or the law, and she did not misrepresent them in the complaint. Thus, it was an abuse of discretion for the PDJ to hold that Garcia violated Rule 11.

### 2. Garcia's Inquiry into the Facts

As described in section II of this opinion, Garcia extensively investigated the facts of this case. Either directly or through an investigator, Garcia reviewed the intake file, spoke several times with Trupp and the mother of the child, spoke with an administrator at the social security office, reviewed the current and previous child support orders, reviewed the records of Trupp's payments, and independently calculated Trupp's arrearages. In fact, the PDJ, in a written decision, found that Garcia

> examined the contents of [Trupp's] file, obtained and reviewed substantial portions of the underlying paternity case, interviewed persons having relevant information, including Trupp, ... researched case law and read *In re Marriage of Wright*.

After completing this research and performing her own calculations with the investigator, Garcia concluded that Trupp was indeed behind in his child support payments. She also knew that Trupp's child was receiving monthly social security payments of approximately $580, and that Trupp believed that these payments would eventually cover his child support obligations. However, she also discovered that Trupp had taken no legal action to apply those payments to his child support obligations.

At the immediate suspension hearing, Trupp conceded all of these points. At the disciplinary hearing, however, Trupp changed his argument and claimed that there had been no arrearage since 1996. Given that Trupp himself had previously conceded arrearages in varying amounts, and no one involved could definitively determine when and by how much Trupp was behind, the fact that the parties disagreed on the arrearage does not reflect any lack of investigation on Garcia's part.

Hence, there is no indication that Garcia failed to investigate the facts in an objectively reasonable manner. We now turn to the question of whether Garcia properly investigated the law.

### 3. Garcia's Inquiry into the Law

Garcia also conducted a reasonable inquiry into the applicable law prior to filing the pleadings. She discovered the relevant case, *In re Marriage of Wright,* which deals specifically with the question of whether and when social security benefits paid to a child may be credited to a parent's child support obligations. 924 P.2d 1207. *Wright* interpreted section 14–10–115(16.5), 5 C.R.S. (1995), which stated that when a child receives social security benefits due to the retirement of a noncustodial parent, "the noncustodial parent's share of the total child support obligation ... shall be reduced in an amount equal to the amount of such benefits." Subsection 14–10–115(16.5) was modified on July 1, 1996, but the text relevant to this case was not altered. Ch. 130, sec. 7, § 14–10–115(16.5), 1996 Colo. Sess. Laws 590, 598. In deciding whether this substitution of social security benefits for child support is automatic, or whether it required a court order, *Wright* concluded:

> [I]n those cases in which a child support obligation has been ordered and the obligated parent becomes eligible for social security benefits, a *motion to modify child support is required* before the child support obligation of the parent may be reduced by the amount of social security benefits paid for the benefit of the child.

924 P.2d at 1209 (emphasis added). In other words, *Wright* says that a parent's child support obligation is not satisfied by social security payments unless and until a court orders it. *Wright* also holds that according to section 14–10–115(16.5), "[t]he child support obligation of a noncustodial parent can *only be reduced prospectively* from the date the motion for modification of child support is filed" (emphasis added). Because this is a recent, uncontradicted court of appeals case interpreting a statute that is directly applicable to

the facts in Trupp's case, Garcia properly relied upon it. Furthermore, Garcia's interpretation of this case was objectively reasonable.

Because we find that the PDJ had no basis for deciding that Garcia inadequately investigated the relevant facts or law, we must next determine whether Garcia properly represented the facts and law in the complaint.

### 4. Garcia's Representation of the Facts and Law

■ Whether an attorney committed an infraction under Rule 11 is a decision committed to the discretion of the trial court, and its ruling will not be disturbed on appeal absent an abuse of discretion. *E–470 Pub. Highway Auth. v. Jagow,* 30 P.3d 798, 805 (Colo.App.2001), aff'd on other grounds, 49 P.3d 1151 (Colo.2002). We apply the same standard to review the PDJ's decision and hold that the PDJ's finding that Garcia violated Rule 11 was an abuse of discretion.

In the relevant allegation, the amended complaint stated:

> On January 4, 2001, in connection with paying his attorney registration fees for the years 2000 and 2001, pursuant to C.R.C.P. 227(2)(a), the respondent *misrepresented* to the clerk of the Supreme Court that although he was not in compliance with respect to any outstanding child support orders, he had taken measures to pay back child support. In fact, the respondent *had not filed any motions or taken any steps to pay his child support arrearages.*

(emphasis added).

In his decision, the PDJ incorrectly wrote that both the complaint and amended complaint alleged that Trupp *"knowingly and intentionally* misrepresented" his child support situation (emphasis added). In fact, Garcia had removed the words "knowingly and intentionally" from the claim prior to filing the first amended complaint. Nonetheless, the PDJ found that the allegation that Trupp "knowingly and intentionally misrepresented" that he had "taken measures to pay back child support" "was not an accurate statement of the investigative facts available to [Garcia]."

The PDJ relied on Garcia's statement in her investigatory notes: "[Trupp] thinks this [social security money] will be applied to child support arrearages." Because of this notation, the PDJ found that Garcia knew that Trupp subjectively believed the social security payments would be applied to his child support obligations. Thus, the PDJ held that Garcia's allegation that Trupp "knowingly and intentionally misrepresented" having taken measures to pay back child support was not an accurate statement of the facts.

The PDJ held that Garcia's logic was "a legal conclusion not reflective of what Trupp had actually done." Including this "inaccuracy" in the complaint, the PDJ ultimately held, violated Rule 11. Moreover, the PDJ found that Garcia did not disclose to the Attorney Regulation Committee "any information regarding Trupp's state of mind in connection with the written words he added to his attorney registration forms" and therefore Garcia was not protected by the usual procedural safeguards in the attorney regulation system. We reject the PDJ's analysis.

Indeed, Trupp told Garcia that he believed that the social security payments, at some point, would be applied to child support arrearages. However, Trupp also admitted that at the time he filed his attorney registration forms he had not yet taken any steps to modify his child support order or to make the payments through the child support registry. As an attorney, Trupp is deemed to have knowledge of the applicable statutes and case law. This is especially true here because Trupp represented clients in domestic relations cases. At the time that Trupp swore that he had taken "measures" to pay his arrearage, he knew or should have known that under *Wright* he was not legally satisfying his child support obligations.

Under the facts and law known to her, it was not unreasonable for Garcia to allege that Trupp had made a misstatement when he said that he had taken "measures" to comply with his child support order. Thus, it was an abuse of discretion for the PDJ to hold that Garcia violated Rule 11. Because

we base our decision on Garcia's own actions and knowledge, we need not examine whether the Attorney Regulation Committee's pre-filing review of the complaint further insulated Garcia from Rule 11 sanctions, as in most cases it would.

## V.   Conclusion

We reverse the finding of the presiding disciplinary judge and hold that Garcia did not violate Rule 11. We remand this case to the PDJ with orders to deny Trupp's Rule 11 motion.

Justice BENDER and Justice KOURLIS do not participate.