The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader.  The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
June 23, 2022

## 2022COA67

**No. 21CA0466, *Colo. Div. of Ins. v. Statewide Bonding* —
Insurance — Colorado Division of Insurance — Immigration
Delivery Bonds; Constitutional Law — Sixth Amendment —
Federal Supremacy — Preemption**

As a matter of first impression, a division of the court of
appeals concludes that the Colorado Division of Insurance's
jurisdiction to investigate and regulate Colorado-licensed insurance
producers that provide immigration bonds is not preempted by
federal law.

COLORADO COURT OF APPEALS      **2022COA67**

---

Court of Appeals No. 21CA0466
State of Colorado Division of Insurance
Case No. IN-2019-E-001

---

Colorado Division of Insurance,

Petitioner-Appellee,

v.

Statewide Bonding, Inc., Non-resident Insurance Producer No. 476070 and
Brian Jerome Cole,

Respondents-Appellants.

---

ORDER AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE SCHUTZ
Welling and Taubman*, JJ., concur

Announced June 23, 2022

---

Philip J. Weiser, Attorney General, Heather Flannery, Senior Assistant Attorney
General, Christopher J.L. Diedrich, Senior Assistant Attorney General, Kyle
McDaniel, Assistant Attorney General, Denver, Colorado, for Petitioner-Appellee

Sheila H. Meer P.C., Sheila H. Meer, Diana R. M. Schanz, Denver, Colorado, for
Respondents-Appellants


*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2021.

¶ 1     In this case involving immigration delivery bonds, respondents, Statewide Bonding, Inc. (Statewide) and Brian Jerome Cole (collectively, Respondents), appeal the final agency order issued by the Commissioner of Insurance (Commissioner).[1]  The Commissioner upheld the decision of an administrative law judge (ALJ) finding that Respondents violated Colorado's insurance statutes and regulations and assessing civil penalties against them. As a matter of first impression, we conclude that the Commissioner's jurisdiction, as delegated to the employees at the Colorado Division of Insurance (Division), to investigate and regulate Colorado-licensed insurance producers that provide immigration bonds is not preempted by federal law.

¶ 2     Respondents also appeal that portion of the Commissioner's order reversing the ALJ's award of attorney fees in favor of Respondents and against the Division.  We affirm in part and reverse in part.

---

[1] The Commissioner is the head of the Colorado Division of Insurance.  § 10-1-104(1), C.R.S. 2021.  The Division of Insurance is housed within the Department of Regulatory Agencies and is charged with the execution of the laws relating to insurance and has a supervising authority over the business of insurance in this state.  § 10-1-103(1), C.R.S. 2021.

1

## I.    Immigration Bonds

¶ 3     To better understand the issues presented on appeal, it is useful to briefly summarize the purpose and operation of immigration delivery bonds.  When an undocumented immigrant has been civilly detained by Immigration and Customs Enforcement (ICE), an immigration judge has the authority to release the immigrant from custody pending the completion of the deportation proceedings.  An immigration delivery bond, much like a traditional criminal bail bond, is the mechanism used to help ensure the immigrant appears at any subsequent hearings.

¶ 4     There are two ways an eligible immigrant can post the bond and be released until a hearing.  *See* Off. of Enf't & Removal Operations, U.S. Dep't of Homeland Sec., ERO 11301.1, Bond Management Handbook 5-6 (Aug. 19, 2014).  First, an immigrant bond sponsor — usually a United States citizen closely related to the immigrant — can pay the full price of the bond, in cash, directly to ICE.  Alternatively, a sponsor can purchase a surety bond through an agent,[2] acting on behalf of an insurance company, and

---

[2] In Colorado, the agent is referred to as an "insurance producer." *See* § 10-2-103(6), C.R.S. 2021.

become a co-obligor on the bond.  In these circumstances, the sponsor pays a premium — generally, a percentage of the total bond amount — to an agent.  In turn, the agent becomes obligated to ensure the immigrant is present at the hearing, and if the immigrant fails to appear, the insurance company[3] is obligated to pay the total amount of the bond to ICE.

¶ 5   Typically, whoever pays the bond premium for the immigrant is also required to pledge collateral to the insurance company to protect the insurance company against loss in the event the immigrant fails to appear.  The collateral, which can be real or personal property, is provided to the agent posting the bond and can be executed upon by the insurance company if the immigrant does not appear.

¶ 6   With this general understanding of immigration bonds, we turn to the facts that gave rise to this dispute.

## II.   Background

¶ 7   In December 2017, the Division received a complaint from a Colorado state probation officer expressing concern that an

---

[3] In Colorado, the insurance company is also sometimes referred to as the "surety" or "insurer."  *See* § 10-2-103(6.5), C.R.S. 2021.

undocumented immigrant under the officer's supervision was possibly being "extorted" by Libre by Nexus, Inc. (Libre), a company involved in posting the immigrant's bond. Upon receipt of the complaint, the Division began investigating the subject transaction.

A. The Investigation

¶ 8     A senior investigator (Investigator) with the Division accessed publicly available online information about Libre and searched the National Association of Insurance Commissioners website for insurance license records. The Investigator's online search revealed news articles critical of Libre for allegedly taking advantage of undocumented immigrants in ICE custody. The National Association of Insurance Commissioners website contained no information that Libre was licensed or had a certificate of authority to transact insurance business in any state.

¶ 9     The Investigator also had a copy of the immigration bond, which had been attached to the complaint. The Investigator saw that the bond had been digitally signed and posted by Cole as the obligor and agent. Statewide, the company for which Cole served as president, was listed as the "Agent-Bonding Company." At the time

of posting the bond, Respondents were both licensed by the Division as nonresident insurance producers.

¶ 10 Yet unlike typical immigration bond arrangements, this bond identified an insurance company, Financial Casualty & Surety, Inc. (FCS), as the obligor. FCS was not licensed or authorized to conduct the business of insurance in Colorado. Moreover, in a separate immigration bond securitization and indemnity agreement, Libre was identified as an indemnitor on the bond. In this agreement, Libre agreed to pay the premium and provide collateral for the bond to Statewide. But instead of Libre posting collateral or paying the premium to Statewide, the undocumented immigrant contractually agreed to lease an ankle monitor from Libre. Under this contract, the immigrant agreed to pay various fees including a GPS activation fee of $460, $420 per month to lease the ankle monitor, and a daily insurance rate.

B. The Inquiry Letters and Responses

¶ 11 Upon learning this information, the Investigator sent an inquiry letter requesting Respondents to provide information related to the undocumented immigrant's bond, information regarding their relationship with FCS and Libre, and a list identifying all

5

immigration bonds they had posted that were indemnified by FCS. Respondents answered most of the questions but objected to the requests for information related to immigration bonds it posted that FCS had agreed to indemnify, alleging that the inquiry was overbroad and unduly burdensome.

¶ 12 After receiving their responses, the Investigator sent a second inquiry letter to Respondents, focusing on their transactions in Colorado in connection with FCS and Libre. The second inquiry requested more information related to the lack of collateral, how Cole would obtain the funds to pay the bond to ICE if payment became necessary, and who would instruct the immigrant about where to appear in court. The inquiry letter also requested documentation related to all immigration bonds for which Cole acted as agent for FCS, all correspondence between Cole and FCS for such bonds, all contracts or correspondence between Libre or its principal and Cole, the identity of all states in which Cole was licensed and where Libre or its principal served as indemnitor for bonds posted by Cole, and details of every immigration bond with a Colorado connection posted by Cole and indemnified by Libre or its principal.

¶ 13    Respondents objected to most of the requests on the grounds that the Division had exceeded its authority because its investigation was preempted by federal immigration law.  The Division disagreed with the objection but granted Respondents an additional opportunity to provide complete responses.

¶ 14    Instead of providing the requested information or asking for a modified inquiry, Statewide surrendered its Colorado license to act as a non-resident insurance producer on July 30, 2018.  Cole subsequently surrendered his Colorado license to act as a non-resident insurance producer on August 10, 2018.

¶ 15    The Division then advised Respondents that the surrender of their licenses did not deprive the Division of its authority to enforce the state's insurance licensing laws, which included investigating allegations of wrongdoing and imposing penalties for violation of those laws.  Again, the Division requested complete responses to its second inquiry letter.  Respondents again rejected the Division's request, stating that because the inquiries appeared to be targeted at Libre, not Respondents, Colorado's producer licensing laws did not apply.

¶ 16    The Division then sent Respondents a formal notice that they had violated Colorado law by not providing complete responses to the Division's written inquiries and provided another opportunity for them to respond.  Respondents declined to do so.

### C.    The Administrative Proceedings

¶ 17    On December 4, 2018, the Division filed a formal notice of charges with the Office of Administrative Courts (OAC), alleging that Respondents had failed to provide a complete and accurate response to the Division's second written inquiry.  The Division sought to impose a civil penalty against each respondent plus a fifteen percent surcharge.

¶ 18    Respondents moved for summary judgment, arguing that federal immigration law preempted the Division's authority to further investigate the complaint.  The ALJ denied the motion, stating that Respondents' preemption argument "miss[ed] the point," because the real issue was whether Respondents, as Colorado licensees, were obligated to respond to the Division's inquiries about their business practices, *not* whether the Division had authority to regulate Respondents' issuance of federal immigration bonds.  The ALJ concluded the Division had not

exceeded the scope of its regulatory authority when issuing its second inquiry letter.

### D. The Division's Unasserted Claim of Privilege

¶ 19    With summary judgment denied, Respondents served the Division with requests for it to produce its entire investigative file in preparation for the hearing.  The Division responded by stating that it was "producing documents relevant to the case . . . up to the issuance of the second inquiry letter."  That same day, the Division filed a motion for a protective order to shield from discovery any portion of its file created after the issuance of the second inquiry letter.  Respondents then filed a motion to compel disclosure of the entire file because portions had been redacted and not listed on the Division's privilege log.  The ALJ granted the Division's motion, yet in its notice of compliance, the Division moved for a second protective order, revealing for the first time that it had "redacted, withheld, or excluded from production" certain portions of the file that had been created before the issuance of the second inquiry letter.  More specifically, the Division had retained documents related to the reporting of the suspicious immigration bond but had

not listed the withheld documents on its privilege log or otherwise disclosed their existence.

¶ 20    The ALJ ordered the fifteen pages of newly disclosed documents to be produced for an in camera review. After completing their review, the ALJ granted the Division's second motion for a protective order.

## E.    The Administrative Hearing

¶ 21    A two-day administrative hearing was held before the ALJ. Following the hearing, the ALJ issued the initial decision, finding that the second inquiry letter, although extensive in its requests, was a valid exercise of the Division's "legitimate regulatory authority." The ALJ concluded that the letter was not "arbitrary, capricious, unduly burdensome, or otherwise an abuse of discretion" because (1) the Division's investigation was not preempted by federal law; (2) public sources of information raised the possibility that Libre and its principal were financially exploiting vulnerable undocumented immigrants; and (3) there were continuing questions about the propriety of Respondents' involvement with FCS and Libre. Because Respondents had not provided a complete and accurate response to the Division's second

inquiry letter, the ALJ imposed a civil penalty of $500 against each respondent plus the statutory surcharge.

¶ 22     The ALJ also ordered the Division to pay Respondents' attorney fees of $1,567.50 as a sanction for its misrepresentation that it had produced its entire file up to the date the second inquiry letter was issued when, in fact, fifteen pages of documents had been withheld and not disclosed on its privilege log or otherwise.

F.     The Commissioner's Final Agency Order

¶ 23     Respondents and the Division then filed exceptions to the ALJ's initial decision.  After a review, the Commissioner issued a final agency order upholding the monetary sanctions against Respondents and reversing the ALJ's attorney fee award against the Division.  The Commissioner concluded that the ALJ did not abuse their discretion by concluding that the Division's authority to conduct the investigation was not preempted by federal law and the inquiry letters were a reasonable exercise of its regulatory authority. Thus, because Respondents' failure to respond to the inquiry letters was not disputed, the Commissioner upheld the fine and surcharge imposed on them.

¶ 24 The Commissioner rejected, however, the ALJ's findings and conclusions regarding the misrepresentations made by the Division concerning the undisclosed initial complaint documents, and the ALJ's corresponding imposition of sanctions upon the Division. The Commissioner set aside the sanctions, concluding that because "[R]espondents were not legally entitled to the disputed information and the Division had a basis to withhold it," coupled with the context of the misrepresentations, no sanction was warranted under C.R.C.P. 11 or 37. Respondents now appeal these portions of the final agency order.

### III. Is the Division's Jurisdiction to Investigate This Complaint Preempted by Federal Law?

¶ 25 Respondents assert that the Division's jurisdiction was preempted because Congress intended to exclusively occupy the field of immigration bonding when enacting 8 U.S.C. § 1103(a)(3)[4]

---

[4] 8 U.S.C. § 1103(a) describes the general powers of the Secretary of Homeland Security. Subsection (1) grants the Secretary the authority to administer and enforce laws relating to the immigration and naturalization of aliens, and subsection (3) grants the Secretary the authority to "establish such regulations; prescribe such forms of bond, reports, entries, and other papers; issue such instructions; and perform such other acts as he deems necessary for carrying out his authority under the provisions of this chapter."

and because the state statutes at issue conflict with federal law. They contend that 31 U.S.C. §§ 9304-9305 and related regulations vest the Secretary of the Treasury with federal surety bonding authority, including the right to discipline and revoke surety certificates.

## A. Standard of Review

¶ 26 A reviewing court may reverse an administrative agency's determination if the court finds that the agency exceeded its constitutional or statutory authority. § 24-4-106(7), C.R.S. 2021; *Ohlson v. Weil,* 953 P.2d 939, 941 (Colo. App. 1997). Because Respondents pose a jurisdictional question, we review the Commissioner's conclusion of law de novo. *Colo. Dep't of Lab. & Emp. v. Esser,* 30 P.3d 189, 193-94 (Colo. 2001).

## B. Analysis

¶ 27 As a predicate matter, there is no doubt that absent preemption by the federal government, the Division had subject matter jurisdiction to investigate the complaint. Title 10 of the Colorado Revised Statutes sets forth a comprehensive regulatory scheme by which the Division, through its Commissioner, is charged with supervising the business of insurance in Colorado.

§§ 10-1-103 to -104, C.R.S. 2021. The Commissioner's key duties include generally supervising the business of insurance in the state to ensure that it is conducted in accordance with state law and in a manner that protects the public. § 10-1-108(7)(a), C.R.S. 2021. This involves investigating and examining reliable information that pertains to possible violations of insurance laws, including those committed by state-licensed insurance producers. *See* § 10-1-108(5).

¶ 28 As defined in title 10, an insurance producer is "[a] person [or business entity] who solicits, negotiates, effects, procures, delivers, renews, continues, or binds . . . [p]olicies of insurance for risks residing, located, or to be performed in [Colorado]." § 10-2-103(6)(a)(I), C.R.S. 2021. Insurance producers must be licensed in Colorado to conduct business in the state. *See* § 10-2-401(1), C.R.S. 2021.

¶ 29 The Commissioner's authority to investigate and discipline licensed insurance producers' conduct can be delegated to the Division and exercised by its employees under section 10-1-104(2), C.R.S. 2021. This investigative and disciplinary authority extends to licensee conduct that suggests

(1) a lack of continued fitness for licensure, § 10-2-801(1)(m), C.R.S. 2021; *see* § 10-2-404(1)(h), C.R.S. 2021 (initially issuing a license requires verification that an applicant is "competent, trustworthy, and of good moral character and good business reputation");

(2) the "[c]ommission of any unfair trade practice or fraud," § 10-2-801(1)(h); and

(3) "[t]he use of fraudulent, coercive, or dishonest practices or demonstrating incompetence, untrustworthiness, or financial irresponsibility in this state or elsewhere," § 10-2-801(1)(i).

¶ 30    Here, because both Cole and Statewide were Colorado-licensed non-resident insurance producers when the investigation was conducted, the plain language of these statutes unambiguously permitted the Division to investigate Respondents' conduct and relationship to activities potentially violative of Colorado insurance laws, subject to any valid claim of preemption. *See Bd. of Accountancy v. Arthur Andersen, LLP*, 116 P.3d 1245, 1247-48 (Colo. App. 2005) (a regulatory entity that authorizes investigations of "persons" rather than just "licensees" means that agency has authority to investigate whether a person violated the laws, even if

15

the license has lapsed or expired).  The relationship between Cole, Statewide, FCS, and Libre created concern and called into question Respondents' fitness to be licensed as insurance producers in Colorado, thus precipitating the next steps of the investigation. Thus, under Colorado law, the Division was acting within its subject matter jurisdiction in conducting this investigation.  But Respondents argue that these state laws are preempted by federal law addressing the issuance and regulation of immigration bonds.

¶ 31     The Supremacy Clause of the United States Constitution provides that federal law is the "supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  Thus, Congress has the authority to preempt state law.  *Arizona v. United States*, 567 U.S. 387, 399 (2012). When assessing any preemption question, we adhere to two fundamental principles.  First, Congress's purpose in enacting the federal legislation is controlling.  *Fuentes-Espinoza v. People*, 2017 CO 98, ¶ 22.  Second, we must presume that Congress did not intend to preempt the historic police powers of the state unless that was the clear and manifest purpose of the federal legislation.  *Id.*

¶ 32     In addition to these general guiding preemption principles, in the context of insurance-related legislation, federal law provides

another central principle.  Under the McCarran-Ferguson Act,

Congress has expressly provided that

> [t]he business of insurance, and every person engaged therein, shall be subject to [state laws] which relate to the regulation . . . of such business. . . .  No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance . . . .

15 U.S.C. § 1012(a)-(b).  The Supreme Court has interpreted this

statute to mean that a state's authority to regulate insurance will

not be deemed preempted unless Congress has expressly stated

such intent or a federal law directly conflicts with continued

regulation by the state.  *See generally Humana Inc. v. Forsyth*, 525

U.S. 299 (1999).  This concept is known as reverse preemption.

*See, e.g.*, *Allen v. Pacheco*, 71 P.3d 375, 381-84 (Colo. 2003)

(defining reverse preemption in the context of whether an

arbitration provision of the Colorado Health Care Availability Act

was preempted by the Federal Arbitration Act).

¶ 33    There are three types of federal preemption: express, field, and

conflict.  *Fuentes-Espinoza*, ¶ 23 (citing *Arizona*, 567 U.S. at 399).

As its name implies, express preemption occurs when Congress

17

enacts legislation that, on its face, expressly preempts state law. *Id.* Respondents concede there is no express preemption in this case.

¶ 34 Instead, Respondents argue that the concepts of field preemption and conflict preemption preclude the Division's exercise of jurisdiction. Field preemption occurs when Congress enacts legislation that is so pervasive that it leaves no room for state action or is so dominant that it precludes the enforcement of state laws on the same subject. *Id.* There are two types of conflict preemption: when simultaneous compliance with both state and federal law is impossible, and "where the challenged state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Id.* (quoting *Arizona,* 567 U.S. at 399).

¶ 35 With these concepts in mind, we turn to the federal legislation related to immigration bonds that Respondents cite in support of their preemption argument. As a starting point, there is no dispute that federal law controls the requirements for the posting and enforcement of federal immigration bonds. 8 U.S.C. § 1103(a)(3); 31 U.S.C. §§ 9304-9308. But it is equally clear that the Division was not seeking to investigate or regulate these topics. Rather, the Division was exercising its authority to investigate and regulate

those persons or companies that choose to provide insurance in the State of Colorado.

¶ 36   In its effort to suggest that these activities are preempted, Respondents rely on 31 U.S.C. §§ 9304-9308.  But none of these statutory provisions reflect a congressional desire to occupy the field of regulating insurance companies, and none of these provisions conflict with the enforcement of Colorado statutes and regulations that prohibit Colorado-licensed insurance producers from engaging in fraudulent, dishonest, coercive, or illegal business practices.

¶ 37   For instance, 31 U.S.C. § 9304, on which Respondents rely, specifies that,

> (a) [w]hen a law of the United States Government requires or permits a person to give a surety bond through a surety, the person satisfies the law if the surety bond is provided for the person by a corporation --
>
> (1) incorporated under the laws of--
>
> . . . .
>
> (B) a State . . . ;
>
> (2) that may under those laws guarantee--
>
> (A) the fidelity of persons holding positions of trust; and

19

(B) bonds and undertakings in judicial proceedings . . . .

Nothing in this statute precludes the Division from investigating licensed insurance producers in Colorado. Indeed, the statute contemplates that surety bonds will continue to be regulated by state law.

¶ 38    Similarly unavailing is Respondents' reliance on

(1) 31 U.S.C. § 9305, which sets solvency requirements for sureties posting federal bonds and authorizes the Secretary of the Treasury to revoke a surety's authority to do business if it falls below a particular solvency standard;

(2) 31 U.S.C. § 9306, which addresses when a surety may issue sureties outside the state in which it is incorporated or has its principal office; and

(3) 31 U.S.C. § 9308, which authorizes the federal government to impose sanctions against those who violate the previously discussed statutes.

¶ 39    Nor is preemption warranted by 8 C.F.R. 103.6(a), (b) (2021), which describe the types of sureties that may be used in posting

20

immigration bonds and ICE's authority to decline bonds from sureties if certain conditions exist.

¶ 40     Similarly misplaced is Respondents' reliance on 31 C.F.R. § 223.5(b) (2021), which provides,

> [n]o bond is acceptable if it has been executed . . . by a company or its agent in a State where it has not obtained that State's license to do surety business.  Although a company must be licensed in the State or other area in which it executes a bond, it need not be licensed in the State or other area in which the principal resides or where the contract is to be performed.

Nothing about this regulation, or any of the other cited statutes or regulations, suggests that the federal government intended to usurp the states' traditional authority to regulate insurance producers and insurers that are licensed to conduct business in their states. Indeed, the regulations clearly reflect that the federal government contemplates that states will continue to license insurance them. Such licensure would be meaningless if the issuing state did not also retain the authority to investigate and regulate insurance producers that engage in fraudulent or otherwise improper conduct. *See, e.g.*, *Alvarez v. Ins. Co. of N. Am.*, 667 F. Supp. 689, 695 (N.D. Cal. 1987) (In interpreting 31 C.F.R. 223.5 (1987) and related

21

regulations, the court concluded that they "do not demonstrate an intention to occupy the field completely. There is no stated intention to preempt state regulation of sureties. The regulations themselves incorporate state law.").

¶ 41    Although not cited in their opening brief, at oral argument Respondents argued that the Colorado Supreme Court's decision in *Fuentes-Espinoza*, 2017 CO 98, supports their assertion of field and conflict preemption in this case. We are not persuaded.

¶ 42    In *Fuentes-Espinoza*, the defendant argued that the state statute under which he was convicted, which made it a crime to provide transportation to an undocumented immigrant who was travelling in Colorado or elsewhere in the United States, conflicted with federal immigration laws. *Id.* at ¶ 10. The supreme court noted that the Immigration and Nationality Act (INA) established a comprehensive federal framework for penalizing the transportation and concealment of undocumented immigrants. *Id.* at ¶¶ 45-49. The court noted the extensive statutory scheme evidenced "Congress's intent to maintain a uniform, federally regulated framework for criminalizing and regulating the transportation, concealment, and inducement of unlawfully present [undocumented

22

immigrants], and this framework is so pervasive that it has left no room for the states to supplement it," thereby creating field preemption. *Id.* at ¶¶ 50-51. In addition, the supreme court concluded that the Colorado statute criminalized a different range of conduct and provided for different levels of punishments than those specified in the INA. *Id.* at ¶¶ 54-59. Because of the comprehensive nature of the INA, and the inherent conflicts between it and the Colorado criminal statute at issue, the supreme court concluded the Colorado statute was also preempted under the doctrine of conflict preemption. *Id.* at ¶ 60.

¶ 43    In contrast to the situation in *Fuentes-Espinoza,* the authorities cited by Respondents do not suggest that Congress intended to occupy the field of regulating sureties to the exclusion of the states. To the contrary, many of the very authorities cited by Respondents expressly contemplate that the states will continue to regulate and license companies that provide surety bonds. Similarly, Respondents have failed to demonstrate the continued regulation of insurance companies by the states that license them will frustrate Congress's purposes in regulating the manner in which immigration bonds are posted. For these reasons, we

23

conclude that neither field nor conflict preemption precludes the Division's enforcement action and corresponding investigation in this case.

¶ 44    In sum, Congress has not manifested its intention to displace Colorado's continued regulation of its licensed insurance producers and insurers, irrespective of whether those insurance providers participate in the issuance of immigration bonds.  Because there is no federal preemption, and because Colorado law unambiguously permits the Division to investigate state-licensed insurance producers for potential violations of state insurance law, the Commissioner correctly concluded that the Division had jurisdiction to investigate Respondents and their relationship to FCS and Libre.

IV.    The Division Reasonably Exercised its Statutory Authority

¶ 45    Respondents next contend that the Commissioner committed reversible error by affirming the ALJ's conclusion that the Division's second inquiry letter was a reasonable exercise of regulatory authority under Colorado law.  We disagree.

A.    Standard of Review

¶ 46    In the context of reviewing a final agency action, we are mindful that a final agency order typically arises, as it did in this

case, out of the agency's review of an ALJ's decision. When reviewing an ALJ's decision, the Commissioner may not set aside the ALJ's findings regarding evidentiary facts unless those facts are contrary to the weight of the evidence, and the Commissioner must defer to the ALJ's assessment of the credibility of the testimony and the weight to be given to the evidence. § 24-4-105(15)(b), C.R.S. 2021; *Koinis v. Colo. Dep't of Pub. Safety*, 97 P.3d 193, 195 (Colo. App. 2003). However, the Commissioner may substitute their judgment for the ALJ's decision with respect to an ultimate conclusion of fact as long as the decision has a reasonable basis in law. *Koinis*, 97 P.3d at 195.

¶ 47 Appellate review of the Commissioner's decision is governed by section 24-4-106(7). That statute permits a court to reverse an administrative agency order only "if it finds that the agency acted arbitrarily or capriciously, made a decision that is unsupported by the record, erroneously interpreted the law, or exceeded its authority." *Koinis*, 97 P.3d at 195. Where, as here, a party challenges the Commissioner's ultimate conclusion of fact, a reviewing court must determine whether substantial evidence in the record as a whole supports that conclusion. *Id.*

## B.     Analysis

¶ 48     Colorado Division of Insurance Regulation 1-1-8(5), 3 Code Colo. Regs. 702-1, requires that "every person shall provide a complete and accurate response to any inquiry from the Division within twenty (20) calendar days from the date of the inquiry."  The regulation defines "complete and accurate" as "a written response that includes all of the information, documents and explanation requested in the Division's inquiry.  If the requested information is not available, the response shall include a detailed explanation of why it cannot be provided."  *Id.* at Reg. 1-1-8(4)(A).

¶ 49     In *Charnes v. DiGiacomo*, the court held that an administrative subpoena for records is enforceable if three criteria are met: "(1) the investigation is for a lawfully authorized purpose; (2) the information sought is relevant to the inquiry; and (3) the subpoena is sufficiently specific to obtain documents which are adequate but not excessive for the inquiry."  200 Colo. 94, 101, 612 P.2d 1117, 1122 (1980) (citing *Okla. Press Publ'g Co. v. Walling*, 327 U.S. 186 (1946)).  Respondents contend that the "compulsory nature" of the Division's second inquiry letter practically served as a documentary subpoena, and therefore the requests should have been reviewed

26

under the *Charnes* standard instead of under an administrative investigative inquiry standard. The Division contends that Respondents failed to adequately preserve this issue for appeal. While the Division's lack of preservation assertion has arguable merit, we view the *Charnes* analytic framework to be useful in evaluating the propriety of an agency inquiry letter that contains a sanction for noncompliance.

¶ 50 Respondents argue that the Division's second inquiry letter fails all three prongs of *Charnes* because (1) the Division's authority to issue inquiry letters is authorized through a regulation promulgated by the Division itself and not by statute; (2) the requested information was irrelevant to its inquiry because the questions made it "evident to Respondents that the Division was not investigating Respondents' 'fitness for licensure,' but was investigating their participation in the Federal Immigration Bond Program"; and (3) the requested information was an "enormous fishing expedition" that was overly broad and unduly burdensome.

¶ 51 In *Charnes*, the court held that the Department of Revenue did not exceed the scope of its authority when issuing a subpoena for a

taxpayer's bank records because the statute granted the director the authority

> to enforce the state tax laws[;] [the] subpoena seeking information to enforce the tax laws [was] a 'lawfully authorized purpose[;]' [i]nformation relating to the correctness of the taxpayer's return or the amount of the taxpayer's income [was] 'relevant' to [the] enforcement of the tax laws . . . [;] and the [agency] limited the scope of the [subpoenaed] records by subject[,] date, [and] the documents sought.

612 P.2d at 1123.

¶ 52    Although the Commissioner's analysis did not cite *Charnes,* we conclude the decision supports the Commissioner's conclusion that the Division did not exceed its authority when issuing its second inquiry letter.  First, based on the previously cited statutes, the Division has the authority to investigate possible violations of Colorado insurance law and the power to promulgate rules to do so.  Moreover, the Division's inquiry letter had a lawfully authorized purpose because it was issued within the scope of the agency's statutory duty to investigate complaints related to the conduct of a licensee.  *Colo. Med. Bd. v. McLaughlin,* 2019 CO 93, ¶ 38.  Second, the Commissioner found a reasonable basis for each item in the

second inquiry letter based upon the scope of the legitimate investigation. Third, the Commissioner found record support for the ALJ's findings and conclusions of law that Respondents failed to establish that the second inquiry letter was unduly burdensome, oppressive, or an abuse of the Division's discretion.

¶ 53　The Division contends we should analyze the second letter as an investigative inquiry letter, the enforceability of which is assessed under a more relaxed standard than a subpoena. To determine whether an investigative inquiry is within an agency's authority, the demand must not be too indefinite, and the information sought must be relevant. *See Eddie's Leaf Spring Shop & Towing LLC v. Colo. Pub. Util. Comm'n*, 218 P.3d 326, 335 (Colo. 2009). Considering the more rigorous analysis we have already conducted under a subpoena theory, we necessarily conclude the demand was not too indefinite, and the information sought was relevant to determining Respondents' potentially violative conduct and their relationship with third parties that may have been engaged in improper conduct.

¶ 54　Therefore, we affirm the Commissioner's conclusion that the second inquiry letter was a reasonable exercise of the Division's

investigative authority because it is based in the law and is supported by substantial evidence in the record.

V.   Commissioner's Reversal of ALJ's Rule 11 Sanctions

¶ 55   Respondents next assert that the Commissioner's reversal of the ALJ's order imposing sanctions against the Division was an abuse of discretion.  We agree.

A.   Standard of Review

¶ 56   Recall that the Commissioner may not set aside the ALJ's findings regarding evidentiary facts unless those facts are contrary to the weight of the evidence, and the Commissioner must defer to the ALJ's assessment of the credibility of the testimony and the weight to be given to the evidence.  *Koinis*, 97 P.3d at 195. However, the Commissioner may substitute their own judgment for the ALJ's decision with respect to an ultimate conclusion of fact as long as the decision has a reasonable basis in law.  *Id.*

B.   Analysis

¶ 57   The ALJ concluded that the Division violated C.R.C.P. 11 when it falsely represented that it had produced the entire investigative file up to the issuance of the second inquiry letter.  Despite making this representation, the Division had not, in fact, disclosed the

existence of fifteen pages of its file related to the initial reporting of the Respondents' allegedly fraudulent activity.  Moreover, the Division did not reference the withheld fifteen pages on a privilege log.

¶ 58     As an initial matter, we point out that the Colorado Rules of Civil Procedure apply to the "extent practicable in administrative hearings."  *M.G. v. Colo. Dep't of Hum. Servs.*, 12 P.3d 815, 818 (Colo. App. 2000); Dep't of Pers. & Admin. Cts. Rule 15, 1 Code Colo. Regs. 104-1.  Neither party argued that Rules 11 and 26 did not apply to this administrative hearing.  Therefore, we proceed in our review of this issue through the lens of C.R.C.P. 11 and C.R.C.P. 26(b)(5)(A).

¶ 59     C.R.C.P. 26(b)(5)(A) requires that "[w]hen a party withholds information required to be disclosed or provided in discovery by claiming that it is privileged . . . , the party *shall* make the claim expressly and *shall* describe the nature of the documents . . . ." (Emphasis added.)  Thereafter, if an opposing party contests the claim of privilege, the party claiming privilege is required to present the information to the court for inspection.  *Id.*

¶ 60     This rule is designed to allow for the protection of privileged

information, while at the same time ensuring that the litigants and

the court know what, if any, documents have been withheld and the

legal and factual basis for withholding them.  *Id.* (The withholding

party "shall describe the nature of the documents, communications,

or things not produced or disclosed in a manner that, without

revealing information itself privileged or protected, will enable other

parties to assess the applicability of the privilege or protection.");

*see also Smithkline Beecham Corp. v. Apotex Corp.,* 193 F.R.D. 530,

534 (N.D. Ill. 2000) ("[T]he description of each document and its

contents [submitted pursuant to Fed. R. Civ. P. 26(b)(5)] must be

sufficiently detailed to allow the court to determine whether the

elements of [the privilege] have been established.  Failing this, the

documents must be produced."); *Kelso v. Rickenbaugh Cadillac Co.,*

262 P.3d 1001, 1003 (Colo. App. 2011) (stating that when state civil

procedure rules are "substantially similar" to federal rules of civil

procedure, the case law interpreting the federal rule is persuasive in

a court's analysis of the state rule).  Moreover, the "failure to

produce a privilege log can result in a waiver of any protection

afforded to [the subject] documents." *Emp.'s Reinsurance Corp. v. Clarendon Nat'l Ins. Co.*, 213 F.R.D. 422, 428 (D. Kan. 2003).

¶ 61 Candor from the litigants and their counsel is essential to this process. If one party unilaterally withholds a document from disclosure but fails to reveal the existence of the document on a privilege log, the opposing party has no way to know the withheld document exists, much less the ability to assess and contest any claim of privilege that has been asserted.

¶ 62 Rule 11 provides as follows:

> The signature of an attorney constitutes a certificate by him that he has read the pleading; that to the best of his knowledge, information, and belief formed after reasonable inquiry, it is well grounded in fact and is warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation. . . . If a pleading is signed in violation of this Rule, the court, upon motion or upon its own initiative, shall impose upon the person who signed it, a represented party, or both, an appropriate sanction, which may include an order to pay to the other party or parties the amount of the reasonable expenses incurred because of the filing of the pleading, including a reasonable attorney's fee . . . .

C.R.C.P. 11(a).

¶ 63    At the administrative hearing, the Division argued that it was justified in withholding the documents, and that it was appropriate not to identify them on the privilege log because to do so would have jeopardized the effectiveness of its investigations and the integrity of the privilege.

¶ 64    The ALJ rejected these arguments on multiple grounds. The ALJ correctly concluded that the clear purpose of section 10-4-1003(8)(a), C.R.S. 2021, which is the statutory foundation of the privilege claimed by the Division, is to protect the anonymity of those who report fraudulent insurance practices. And the ALJ also correctly concluded that the general document description mandated by Rule 26(b)(5)(A) would not compromise that central purpose. Thus, the ALJ found the Division's proffered justification for not listing the withheld documents on a privilege log unavailing. These legal conclusions and factual findings are amply supported by the record and the applicable law.

¶ 65    The ALJ also reasoned that although the Division's second motion for a protective order was ultimately granted, that did not vitiate the Division's misrepresentation in its earlier motion for a

protective order that it had produced its entire file up until the date of the second inquiry letter. Based upon this affirmative misrepresentation, the ALJ concluded the Division had violated Rule 11 and ordered it to pay $1,567.50 to Respondents as compensation for their attorney fees expended because of the violation.

¶ 66 The Commissioner rejected and set aside the ALJ's findings and conclusions of law, reasoning that "the conduct at issue here is not legally sufficient to satisfy the standard for imposing sanctions under C.R.C.P. 11." Rather than focusing on Rule 11, the Commissioner stated that the "core dispute — regarding disclosure of the Division's file and whether portions of the Division's file were the proper subject of a protective order — was properly and fully resolved by the ALJ under the discovery rules." Citing no authority, the Commissioner stated, "in seeking the protective order, the Division's motion was not required to address privilege issues related to portions of the investigative file that were subject to discovery."

¶ 67 Because the ALJ ultimately determined that the fifteen pages could be withheld, the Commissioner concluded no sanctions were

warranted under C.R.C.P. 37. And because the Division's original disclosures included generalized assertions of privilege, and the misrepresentation was made in the context of a motion for a protective order, the Commissioner concluded the Division's misrepresentation should not be governed by Rule 11 and to the extent Rule 11 applied, the misrepresentation was not so egregious as to warrant sanctions.

¶ 68    We conclude the Commissioner's decision on this issue does not give appropriate deference to the evidentiary factual findings made by the ALJ, and it disregards the ALJ's ultimate conclusion of fact without a reasonable basis in law.

¶ 69    Irrespective of whether the motion for a protective order, which contained the misrepresentations, is characterized through the lens of a discovery dispute or general motion practice, the mandates of Rule 11 apply to all representations made by counsel in their filings with the ALJ. *See Jensen v. Matthews-Price*, 845 P.2d 542, 544 (Colo. App. 1992) ("[A]n attorney or litigant who signs a motion or other paper has the same obligation as the signer of a pleading to ensure that the document is factually and legally justified."). The ALJ, with record support, found the statement in the Division's

motion that it had produced the entirety of its file up until the issuance of the second letter was false. The Commissioner pointed to no reason why the ALJ's factual conclusion was not supported by the record. Moreover, the representation was certainly material and, for the reasons previously described, critical to the discovery process. A party cannot be excused from such an affirmative misrepresentation simply because it ultimately prevails on the dispute that gave rise to the filing of the motion in which the misrepresentation was made. *See In re Trupp*, 92 P.3d 923, 930 (Colo. 2004). Thus, the imposition of sanctions against the Division was well within the ALJ's discretionary authority. The Commissioner's contrary conclusion is not grounded in a reasonable basis in law.

¶ 70 For all of these reasons, we reverse the Commissioner's decision to set aside the ALJ's Rule 11 sanctions.

## VI. Non-Party Findings of Fact

¶ 71 Finally, Respondents contend that the Commissioner erred when affirming the ALJ's findings and conclusions relating to FCS, Libre, and Libre's principal. They argue that these non-parties were entitled to "due notice" before the ALJ issued the initial decision,

and that because Respondents are collaterally prejudiced by these findings and conclusions, they have standing to assert this issue on appeal.

¶ 72    We reject this contention on multiple grounds.  First, FCS, Libre, and Libre's principal are not parties to this appeal.  Nor were they parties to the underlying administrative action.  § 24-4-106(4) ("[I]f such agency action occurs in relation to any hearing pursuant to section 24-4-105, then the person [seeking judicial review] must also have been a party to such agency hearing.").

¶ 73    Second, Respondents failed to preserve this issue for appeal.  Arguments never presented to, considered by, or ruled upon by a trial court may not be raised for the first time on appeal.  *Est. of Stevenson v. Hollywood Bar & Cafe, Inc.*, 832 P.2d 718, 721 n.5 (Colo. 1992).  Moreover, a reviewing court is not required to address specific arguments not made to the Commissioner on appeal from an ALJ.  *See City & Cnty. of Denver v. Indus. Claim Appeals Off.*, 58 P.3d 1162, 1165 (Colo. App. 2002).

¶ 74    Therefore, we decline to address this issue.

## VII. Conclusion

¶ 75    Pursuant to section 24-4-106(7)(b), we reverse that portion of the Commissioner's order setting aside the ALJ's award of attorney fees and remand with instructions to reinstate the ALJ's ruling. The order is otherwise affirmed.

JUDGE WELLING and JUDGE TAUBMAN concur.